**FIFTH THIRD BANK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 95–503C.

United States Court of Federal Claims.

May 26, 2006.

---

Alan M. Grimaldi, Washington, DC, for plaintiff. Jennifer R. Bagosy, Howrey, LLP, and Robert M. Bruskin, Washington, DC; James Hubbard, and Peter Stautberg, Fifth Third Bank, Cincinnati, OH, of counsel.

David A. Levitt, Washington, DC, with whom was Deputy Assistant Attorney General Stuart E. Schiffer, for defendant. Arlene Pianko Groner, Brian A. Mizoguchi, Mark T. Pittman, John H. Roberson, and John J. Todor, Department of Justice, of counsel.

## OPINION

MILLER, Judge.

This *Winstar* case is before the court after remand for trial on damages. *See Fifth Third Bank of W. Ohio v. United States*, 402 F.3d 1221 (Fed.Cir.2005), *rev'g in part, aff'g in part, and remanding, Fifth Third Bank of W. Ohio v. United States*, 56 Fed.Cl. 668 (2003). In the midst of the savings and loan crises of the late 1970's and early 1980's, to save deposit insurance funds, the Federal Government induced a series of brokered unions between healthy and unhealthy thrift institutions, promising the healthy acquirers special accounting treatment in recompense. However, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") eliminated this special accounting treatment, thereby spiraling a number of acquirer institutions into insolvency.[1]

1. Although key aspects of the industry's downfall and Congress's draconian remedial legislation are discussed in this opinion, the United States Supreme Court and United States Court of Appeals for the Federal Circuit have provided extensive explication of the thrift crisis and its litigative aftermath. *See United States v. Winstar Corp.*, 518 U.S. 839, 844–58, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996); *Anderson v. United States*, 344 F.3d 1343, 1345–47 (Fed.Cir.2003); *Castle v. United States*, 301 F.3d 1328, 1332–33 (Fed.Cir. 2002); *Landmark Land Co., Inc. v. Fed. Deposit Ins. Corp.*, 256 F.3d 1365, 1369–71 (Fed.Cir.

In the instant case, the United States Court of Appeals for the Federal Circuit, reversing the trial court, determined that a contract existed between plaintiff and the Federal Government for special accounting treatment. The Federal Circuit remanded for a trial to determine whether the breach of contract damaged plaintiff and, if so, the amount of damages. The court determines that the breach caused the damages in the amount of $76.523 million (after tax gross-up). These damages are relatively modest in the context of *Winstar* litigation. *Cf. Slattery v. United States*, 69 Fed.Cl. 573 (2006) (awarding $26.5 million in damages per page in a fourteen-page opinion, for a total of $371.733 million); *Home Sav. of Am. v. United States*, 69 Fed.Cl. 187 (2005) (awarding $134 million), *aff'd in part and vacated on other grounds*, 399 F.3d 1341 (Fed.Cir.2005); *see also Westfed Holdings, Inc. v. United States*, 407 F.3d 1352 (Fed.Cir.2005) (affirming award to the extent of $210.6 million); *Glendale Fed. Bank, FSB v. United States*, 378 F.3d 1308 (Fed.Cir.2004) (affirming award of $381 million in full).

## PROCEDURAL HISTORY

Fifth Third Bank of Western Ohio [2] ("plaintiff") filed its original complaint on August 4, 1995, alleging breach of contract and a taking for which compensation was due with regard to transactions of its predecessor-in-interest, Citizens Federal Bank, FSB ("Citizens") with five Ohio thrifts that took place during the 1980's. The case was assigned to this court on January 11, 2002, after completion of discovery. It has metastasized into eight prior published decisions, seven by the undersigned.

### 1. *Summary judgment on liability*

On April 12, 2002, this court denied both plaintiff's motion for partial summary judgment and defendant's motion for summary judgment on liability. *See Fifth Third Bank of W. Ohio v. United States*, 52 Fed.Cl. 264 (2002) ("*Fifth Third I*"). Plaintiff had filed a

"Short–Form" Motion for Partial Summary Judgment on the issue of the Government's liability. Defendant opposed the motion and moved for summary judgment on the ground that the evidence showed only regulatory approval of the mergers in question, not intent to contract. Defendant argued that regulatory documents, which manifested the only written evidence of any agreement between plaintiff and the Government, were insufficient to prove intent to contract.

The court rejected the arguments of both plaintiff and defendant. The court noted that a written agreement memorializing the contract was not required and that regulatory documents would be sufficient if "the reality of [the] transaction favors construing such documents as contractual undertakings, as opposed to regulatory statements ...." *Fifth Third I*, 52 Fed.Cl. at 274–75. Plaintiff had the burden of proving the intent to contract by these documents in combination with testimony and other evidence.

In a footnote to the *Fifth Third I* opinion, the court pointed out that defendant had earlier contended that the Federal Home Loan Bank, Cincinnati ("FHLB–Cincinnati"), lacked the authority to make promises regarding accounting treatment on the Government's behalf. However, defendant had not briefed this argument in over a year, nor attempted to address new case law on point. The court thus concluded both that the argument was abandoned and that, even if it were not abandoned, it would be contrary to settled case law. *See Fifth Third I*, 52 Fed.Cl. at 269 n. 9. On June 12, 2002, at defendant's request, the court reconsidered this issue. *See Fifth Third Bank of W. Ohio v. United States*, 52 Fed.Cl. 637 (2002) ("*Fifth Third II*"). Although withdrawing its holding that the claim had been abandoned, the court reaffirmed its conclusion that the Federal Home Loan Bank ("FHLB") possessed the appropriate authority. The court concluded that FHLB–Cincinnati had implied actual authority to enter into the goodwill contracts with plaintiff. *Fifth Third II*, 52 Fed.Cl. at

2001); *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1376–78 (Fed.Cir.2001).

**2.** Citizens Federal Bank, FSB ("Citizens"), merged into plaintiff on August 14, 1998. Plaintiff is thus successor-in-interest to Citizens' claims.

643. On appeal the Federal Circuit agreed with this reasoning. *Fifth Third Bank of W. Ohio v. United States*, 402 F.3d 1221, 1235 (Fed.Cir.2005) (*"Fifth Third VIII"*).

### 2. Motion to dismiss claims related to Sentry Savings and Loan

Plaintiff's original complaint, filed August 4, 1995, alleged breach of contract and takings claims based upon transactions involving five Ohio thrift acquisitions. On October 23, 1996, plaintiff amended the complaint to add a sixth thrift, Sentry Savings and Loan Company ("Sentry"). Defendant challenged this addition on the grounds that it violated the statute of limitations.

On July 12, 2002, the court held that this addition was beyond the statute of limitations because it was filed after the applicable statute of limitations had expired and did not relate back to the original claims. See *Fifth Third Bank of W. Ohio v. United States*, 52 Fed.Cl. 829 (2002) (*"Fifth Third III"*).

### 3. Summary judgment on damage theories

On February 10, 2003, the court granted defendant's summary judgment motion as to certain categories of damages claimed by plaintiff. See *Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. 223 (2003) (*"Fifth Third IV"*). Plaintiff presented several claims for expectancy damages, reliance damages, restitution damages, and incidental damages, as detailed more specifically below. Defendant contended that plaintiff had failed to raise a genuine issue of material fact that would entitle plaintiff to a trial on its claims for lost profits.

Under the theory of expectancy damages, plaintiff asked for the amount of profits that it would have made, but for the breach, by leveraging the goodwill in order to make more loans and investments. Plaintiff proposed to measure these damages by hypoth-

esizing a "But-for Bank" that would have existed absent FIRREA, maintained the goodwill towards its regulatory capital requirements, and invested the money at a projected rate of return.[3] Projecting a rate of return based upon Citizens' actual performance in the period between the breach and 1998, this method calculated the lost profits to be $25.927 million. Because, *inter alia*, plaintiff was unable to identify any specific opportunities in which Citizens otherwise would have invested, the court ruled that the lost profits claim was too speculative and unforeseeable as a matter of fact and law. *Fifth Third IV*, 55 Fed.Cl. at 242. The court thus foreclosed plaintiff's lost profits claim. This ruling was not appealed.[4]

Plaintiff also asked for an alternative form of expectancy damages under the doctrine of cover. Plaintiff proposed to measure its damages by using a capital replacement model to calculate the cost of the $59 million in supervisory goodwill withdrawn by the passage of FIRREA. The court granted summary judgment against plaintiff on cover damages, however, because at the time Citizens was a mutual association and thus unable to issue preferred stock. *Id.* at 244. The proposed method of measuring damages was rendered unrealistic and speculative. The Federal Circuit affirmed this ruling. *Fifth Third VIII*, 402 F.3d at 1237 (stating that "[p]laintiff's cover damages claim, like lost profits claims, is highly speculative").

In addition, plaintiff also sought restitution damages calculated either on the basis of net liabilities assumed by the thrift or calculated from the Government's actual historic cost in dealing with failing thrifts. This court ruled that the first method was contrary to established case law and the second lacked a basis in reality. *Fifth Third IV*, 55 Fed.Cl. at 245. Plaintiff alternatively asked for reliance damages, based upon the liabilities assumed by

---

**3.** Included in these calculations were plaintiff's claims for the forced divestiture of Citizens' Cincinnati branches and for reduced conversion proceeds from the forced mutual-to-stock conversion. As will be discussed, these claims survived as breach damages.

**4.** In reviewing the decision on plaintiff's appeal of the rejection of an alternate damages theory, however, the Federal Circuit stated that, "[t]he lost profits theory, though not absolutely barred in *Winstar*-related cases as a matter of law, has not been susceptible of proof due to its speculative nature." *Fifth Third VIII*, 402 F.3d at 1236.

Citizens, which this court also denied as contrary to established law. See *id.* at 246. These judgments were not appealed.

Finally, plaintiff requested that the court grant it "incidental damages" caused by the forced conversion and the loss of the Cincinnati branches. *Id.* at 246. Plaintiff alleged that, had the regulators not forced Citizens to convert from a mutual to a stock company in January 1992, Citizens would have waited to convert until August 1993, "timed the market," and sold its stock at a higher price. In addition, if Citizens had not been forced to sell its Cincinnati branches, its stock would have commanded a higher premium, and it would have made additional money in the sale of the thrift to Fifth Third in 1993. This court ruled that these aspects of the calculation did not suffer from the same speculativeness as the lost profits claims and allowed them to go forward. *Id.* at 246–47.

#### 4. *Motion to dismiss for lack of standing*

On February 10, 2003, the court issued a separate opinion addressing the allegation that plaintiff had failed to state a claim upon which relief could be granted because it lacked standing to sue. See *Fifth Third Bank of W. Ohio v. United States*, 55 Fed.Cl. 372 (2003) (*"Fifth Third V"*). Defendant had argued that only those who had deposited money in Citizens before its conversion from a mutual to a stock company were harmed by the passage of FIRREA and that plaintiff had not purchased the right to bring suit. Analogizing the nominal ownership of depositors in a thrift to shareholders and investors not integrally involved in the formation of supervisory merger contracts, this court held that depositors would not have standing to sue. 55 Fed.Cl. at 380. Whatever rights the depositors held were subsumed by Citizens for good consideration. *Id.* at 381. Because plaintiff is Citizens' proper successor-in-interest on these claims, plaintiff has standing to sue. *Id.* The court denied defendant's motion to dismiss for failure to state a claim and granted plaintiff's cross-motion for summary judgment on the issue. This decision was not appealed.

#### 5. *The 2003 trial*

After these five dispositive motions, the case proceeded to trial on the questions of liability and the amount of damages. See *Fifth Third Bank of W. Ohio v. United States*, 56 Fed.Cl. 668 (2003) (*"Fifth Third VI"*). At the conclusion of plaintiff's case-in-chief, defendant moved for judgment on partial findings on both issues under RCFC 52(c).

Although the court denied the motion on damages, holding that plaintiff had presented sufficient facts to show that it had been damaged, this court granted the motion regarding liability. This court held that plaintiff had failed to establish liability as a matter of fact and law, through the decanted testimony on contract formation presented by plaintiff. Both the Supervisory Agent at the FHLB–Cincinnati, Lawrence B. Muldoon, and Citizens' President and Chief Executive Officer, Jerry L. Kirby, believed that they had entered into a contract concerning the regulatory treatment of goodwill, although the only written evidence of this agreement was contained in documents giving regulatory approval to the mergers. While the court held that written evidence was not required to create a Winstar contract, see *Fifth Third I*, 52 Fed.Cl. at 274–75, the lack of significant written evidence in the instant case, combined with the rote nature of the witnesses' testimony, showed no mutual intent to contract regarding the treatment of goodwill.

Therefore, the court held that no contract was formed and granted defendant's motion for judgment on liability. *Fifth Third VI*, 56 Fed.Cl. at 696.

#### 6. *Summary judgment on Fifth Amendment claims*

After the trial the only claims that remained pertained to alleged takings of property under the Fifth Amendment of the United States Constitution. On August 6, 2003, the court granted summary judgment against plaintiff on these remaining Fifth Amendment claims, see *Fifth Third Bank of W. Ohio v. United States*, 57 Fed.Cl. 586 (2003) (*"Fifth Third VII"*), and plaintiff did not appeal.

### 7. Federal Circuit opinion on appeal

The case came before the Federal Circuit on plaintiff's appeal. Plaintiff appealed the court's *Fifth Third VI* judgment on partial findings that no contract had been formed between Citizens and the United States, as well as the court's *Fifth Third IV* summary judgment decision on the issue of expectancy damages measured by the method of a hypothetical issue of preferred stock as "cover." Defendant, as an alternative ground for upholding the judgment, challenged the court's determination in *Fifth Third I* and *Fifth Third II* that the Supervisory Agent at FHLB–Cincinnati possessed implied actual authority to contract.

The Federal Circuit agreed with the trial court's finding that the regulators possessed implied actual authority to contract and affirmed the court's holding that plaintiff's claims for expectancy damages based on the doctrine of cover were too speculative to sustain an award of damages. *See Fifth Third VIII*, 402 F.3d at 1235, 1237. The Federal Circuit reversed the court's ruling on liability, holding that a contract did exist between Citizens and the Government and that it had been breached. Analyzing its case law, the Federal Circuit stated that it had "ultimately found the Government liable for breach of contract in these *Winstar*-related cases when the evidence demonstrates that . . . the parties agreed the acquiring

thrift was to be given favorable accounting treatment of supervisory goodwill and its amortization." *Fifth Third VIII*, 402 F.3d at 1231. Such agreements, when viewed within "a larger context in which the Government enlisted the aid of a major sector of the banking industry," *id.* at 1233, are raised to the level of legal contracts, *see id.* Under this standard for contract formation, the Federal Circuit found and concluded that a contract had been formed between plaintiff and the Government.[5] The case was "remanded to the trial court for determination of damages, if any, to be awarded."[6] *Fifth Third VIII*, 402 F.3d at 1237.

### 8. The 2006 trial

After limited discovery and pretrial proceedings, a second trial ended on January 19, 2006. The issue of contract and breach having been settled by the Federal Circuit, the trial focused on the issues of causation and damages. Because plaintiff rested its case in 2003, trial resumed with defendant's case in chief, followed by plaintiff's rebuttal. Closing argument was heard on March 14, 2006, preceded by limited post-trial briefs filed on March 1, 2006.

### FACTS [7]

The facts in this case are also discussed in *Fifth Third I* through *Fifth Third VIII*. They

---

**5.** The Federal Circuit also took issue with the failure of the trial court "to give proper weight to the circumstances as well as the evidence." *Fifth Third VIII*, 402 F.3d at 1233. Presumably, the improper weight the court gave to the evidence after a trial on the merits was not the focus of the Federal Circuit's reversal. The court humbly reads the Federal Circuit's opinion, rather, to turn on the legal standard for contract formation and its applicability to the facts as the trial court found them.

**6.** This ruling leaves open the question of causation, which the Federal Circuit did not address.

**7.** Although the court has considered and weighed the testimony of every witness, discussion of each one is not necessary in order to render a comprehensive decision. Plaintiff's factual witnesses were identified in *Fifth Third VI*, 56 Fed.Cl. 668, and will be repeated only as necessary for the purposes of this decision.

Plaintiff presented several experts in the 2003 trial. R. Dan Brumbaugh, Jr., a senior finance

fellow at the Milken Institute and a Ph.D. in economics, was plaintiff's expert in economics in relationship to thrifts and banking institutions and calculations of damages for savings institutions. Christopher James, a William H. Dial/Suntrust Eminent Scholar in finance and banking, was plaintiff's expert in economics, corporate finance including thrift and banking finance, thrift and banking industries, financial markets, capital acquisition process, and economic analysis of damages. Ronald S. Riggins, President and Managing Director of RP Financial, was plaintiff's expert in mutual-to-stock conversions, appraisal and valuation of thrifts and stock companies, and the means and methods by which thrifts raise capital.

In 2006 plaintiff added one fact witness: James B. Haas, Director of Corporate Tax for Fifth Third Bank, who testified regarding past rates of federal taxation for Fifth Third Bank and the projected future rates of federal taxation.

In its case-in-chief, defendant offered as fact witnesses: (1) Arthur Lee Lassiter, Jr., formerly a Supervisory Agent with the FHLB–Cincinnati, a

are repeated only as necessary for purposes of decision.

## I. *The parties*

Plaintiff is headquartered in Dayton, Ohio, and is a division of Fifth Third Bancorp ("Fifth Third"). Fifth Third is a diversified financial services company headquartered in Cincinnati, Ohio. In 1998 plaintiff acquired Citizens and became the successor-in-interest to Citizens' claims in this case. *See* Order entered Oct. 1, 1998 (granting motion for substitution of transferee).

Citizens, a federally chartered mutual savings and loan association, was organized in 1934 and was headquartered in Dayton, Ohio. Founded and operated as a mutual institution, Citizens was converted to a stock institution on January 29, 1992. Primarily, Citizens raised deposits from the general public and used them to fund home mortgages. In the 1980's Citizens implemented a plan to expand its market area and product lines. Citizens sought out opportunities to open branch offices in the Columbus and Cincinnati markets, and became only the second savings and loan in the country to receive the approval of the Federal Home Loan Bank Board ("FHLBB") to open a trust department. Contrary to defendant's insinuations, such innovations were not reflective of poor thrift management, but actually reflected a sound business plan to expand and grow the thrift.

## II. *The acquisitions*

The problems with the savings and loan industry in the late 1970's and early 1980's, and the policy of the regulators to encourage takeover of troubled thrifts, had a direct effect on Citizens. In 1981 FHLBB invited Mr. Kirby to a conference in Washington, DC, to discuss the possibility of healthy thrifts, such as Citizens, assisting to rid the industry of failing thrifts through a process of mergers and acquisitions. Further negotiations between FHLBB regulators, Messrs. Muldoon and McElheney, and Citizens' President, Mr. Kirby, resulted in a series of binding contracts that would allow Citizens to book the excess of the purchase price over the value of the net liabilities of the failing thrifts it acquired as supervisory goodwill. All four transactions were booked under the purchase method of accounting, which generated supervisory goodwill.

Between 1982 and 1985, Citizens entered into six such transactions.[8] Thirteen of the branch offices that Citizens acquired were located in and around the Cincinnati area and together are referred to as Citizens' "Cincinnati division."

These acquisitions furthered Citizens' business plan of expanding into the Cincinnati market. All of the target institutions that Citizens acquired were failing at the time of their acquisition. Even so, between 1982 and

Deputy District Director with the Office of Thrift Supervision (the "OTS") in Cincinnati, and a Deputy Director for Industry Rehabilitation and an Ombudsman with the OTS in Washington, DC; (2) Ronald T. Leonard, who was a Senior Examination Specialist with the FDIC in Chicago during the relevant time period; and (3) David K. Mangian, who served as a Regional Director for Compliance and Consumer Affairs with the FDIC in Chicago.

Defendant also presented several expert witnesses. Anthony Saunders is the John M. Schiff Professor of Finance and Chairman of the Department of Finance at New York University's Stern School of Business. Prof. Saunders was qualified to offer opinion testimony in the areas of banking and finance, thrift operations, financial economics, performance of damage assessments, general economics, regulation of financial institutions, federal deposit insurance, the performance of the savings and loan industry in the 1980's and 1990's, and in the evaluation of appraisals based on their consistency with publicly available data.

Haluk Unal is a Professor of Finance at the University of Maryland's Robert H. Smith School of Business. Prof. Unal gave qualified opinion testimony in economics, finance, banking, the process and pricing of mutual-to-stock conversions of financial institutions, and the appraisal process, but specifically excluding certain OTS guidelines with which Prof. Unal holds fundamental disagreement.

Maurice J. Whalen, CPA, is a former Director of Ellin & Tucker, Chtd., a Mid-Atlantic business consulting and accounting firm. Mr. Whalen was defendant's expert in accounting, damage assessments, financial analysis, management consulting, and the audits of mergers and acquisitions.

In rebuttal plaintiff recalled two of its damage experts, Dr. Brumbaugh and Mr. Riggins.

8. *Fifth Third I*, 52 Fed.Cl. at 265–69, discusses these transactions in detail.

1985, as a result of these transactions, Citizens' assets grew to $2 billion, and in 1986 it had record earnings of $20.4 million. However, the parties disagree regarding the reasons for this success. Plaintiff, through Mr. Kirby, attributed it to "good business management and a fine board of directors." Transcript of Proceedings, *Fifth Third Bank of W. Ohio v. United States,* No. 95–503C, at 270 (Fed. Cl. Mar. 10–26, 2003 & Jan. 9–19, 2006) ("Tr."). Defendant, through its fact witnesses and economic experts, paints the success as illusory.

With each transaction the amount of tangible capital possessed by Citizens decreased and was replaced with intangible "goodwill." Pre–FIRREA, at the time of the fourth transaction, Citizens had a regulatory capital ratio of 3.4%, which exceeded the regulatory capital requirement at the time. Without the special goodwill treatment afforded to it by its contracts with the Government, however, Citizens' capital ratio would have been negative, at –1.27%. A negative ratio manifests not only capital noncompliance, but also insolvency. Unremarkably, Mr. Kirby testified that the transactions would not have made sense had Citizens not been able to count goodwill toward its capital requirements.

## III. *The impact of FIRREA*

In 1989 Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"). *See generally* Pub.L. No. 101–73, 103 Stat. 183. This legislation made sweeping changes to the banking industry, including the elimination of supervisory goodwill as a means of satisfying capital requirements. FIRREA implemented new capital requirements effective December 7, 1989. *See Winstar,* 518 U.S. at 856–57, 116 S.Ct. 2432. FIRREA also abolished the Federal Savings and Loan Insurance Corporation ("FSLIC") and FHLBB as thrift regulators. In their place, it set up the Office of Thrift Supervision (the "OTS") as the primary thrift regulator and the Federal Depos-

it Insurance Corporation (the "FDIC") as the backup regulator and insurer of Citizens.

### 1. *Resulting capital deficiency*

The passage of FIRREA deflated the financial structure of Citizens' pre-FIRREA acquisitions. The statute established three new regulatory capital categories: tangible capital, core capital, and risk-based capital. Not only did these new capital requirements exclude goodwill as an asset, in general they were more strict than the requirements previously in place.

This new accounting technique had a severe impact on Citizens. Before the enactment of FIRREA, Citizens held $40 million in capital above the minimum regulatory requirement. Post-enactment Citizens had an immediate tangible capital deficiency of $5.7 million. FIRREA phased out goodwill from the core capital requirement over several years. Despite the gradual elimination, Citizens immediately was out of core capital compliance by $6.6 million. FIRREA also phased goodwill out of the risk-based capital requirement. Even so, Citizens had an immediate risk-based capital deficiency of $53.7 million. Thus, with the enactment of FIRREA, Citizens was rendered out of compliance with respect to all three of the capital categories.[9]

An OTS report, dated November 13, 1989, anticipated that Citizens would be unable to meet the new capital requirements when they were implemented on December 7, 1989. The report stated that, because of the new regulations, "we believe ... [Citizens] will fail one or more of the new capital requirements. As a result, the association will be required to submit a capital restoration plan to this office by January 8, 1990." Report of Examination (Nov. 13, 1989), PX 573, at 4; *see Fifth Third VI,* 56 Fed.Cl. at 682. In fact, an OTS report dated November 25, 1991, stated that "[t]he association previously was able to exceed minimum regulatory requirements due to the high amount of good-

---

9. By contrast, if FIRREA had implemented the new regulatory capital requirements while allowing goodwill to count as an asset, Citizens would have been in compliance with the tangible capital and core capital requirements, but out of

compliance with the risk-based capital requirement in the amount of approximately $23 million. *See* Expert Report of Dr. R. Dan Brumbaugh, PX 1486, at 26.

will on its books. Following the passage of FIRREA, the association failed each of the three new minimum capital standards[.]" Regulatory Plan (Nov. 25, 1991), PX 779, at 3; *Fifth Third VI*, 56 Fed.Cl. at 682; *see also* Tr. at 1933–34 (Mr. Muldoon stating that PX 779 was a regulatory plan created by the OTS).

### 2. *Capital plans and actions of the regulators*

This failure to meet the capital requirements subjected Citizens to regulatory requirements, such as filing a capital plan for approval, *see* Citizens Business–Capital Restoration Plan 1990–1992 (Jan. 4, 1990), PX 598; Citizens Business–Capital Restoration Plan 1990–1992, (Jan. 4, 1990, amended Feb. 16, 1990), PX 611; Citizens Business–Capital Restoration Plan 1990–1994 (Jan. 4, 1990, revised June 15, 1990), PX 660; Citizens Business–Capital Restoration Plan, 1990–1994 (June 15, 1990, revised Aug. 17, 1990), PX 690; and restrictions on its ability to make new loans or investments without written approval of the regulators, *see* Letter from Lawrence B. Muldoon to Citizens Board of Directors (May 14, 1990), PX 636, at 2.

Citizens filed its first capital plan with the OTS on January 5, 1990, then revised it on February 16, 1990. *See* Citizens Business–Capital Restoration Plan 1990–1992 (Jan. 4, 1990), PX 598; Citizens' Business–Capital Restoration Plan 1990–1992 (Jan. 4, 1990, amended Feb. 16, 1990), PX 611. These plans made no mention of the sale of the Cincinnati division as a proposed solution to the capital deficiency, nor of conversion. They purported to set out a plan by which Citizens would meet all of FIRREA's phased-in capital standards by the end of 1994.

The FDIC recommended to the OTS that this revised plan was "incomplete," Letter from George J. Masa to Lawrence B. Muldoon (May 2, 1990), PX 633, at 2, and the OTS agreed, rejecting the plan on May 14, 1990. After the rejection Citizens was put under restrictions that limited "new loans or investments except with prior written approval" of the regulators. Letter from Lawrence B. Muldoon to Citizens Board of Directors (May 14, 1990), PX 636, at 2.

On May 18, 1990, Citizens' management met with the OTS and the FDIC regulators. The regulators discussed their initial findings regarding the financial health of Citizens and the impact of the rejection of the capital plan on Citizens' operations. Ronald T. Leonard, who was a Senior Examination Specialist with the FDIC in Chicago during the relevant time period, indicated that one option that the regulators would consider was withdrawal of Citizens' federal deposit insurance, which Mr. Kirby testified effectively would shut down the bank.[10] The OTS also advised Citizens that it should "consider outside sources for capital restoration." John A. Buchheid, OTS, Memorandum to the File (May 23, 1990), PX 651, at 2.

On May 31, 1990, the regulators met with Mr. Kirby and William M. Vichich, who was Citizens' Chief Financial Officer at the time (deceased after first trial). Citizens was advised that the next revision of the capital plan should reflect full compliance with FIRREA's requirements by 1992, which was two years ahead of the 1994 statutory deadline for full compliance. John A. Buchheid, OTS, Memo to Supervisory File (May 31, 1990), PX 653, at 2.

Citizens submitted its next revised plan on June 15, 1990. *See* Citizens Business–Capital Restoration Plan 1990–1994 (Jan. 4, 1990, revised June 15, 1990), PX 660. This plan purported to put Citizens in full compliance by 1992. On June 28, 1990, Mr. Kirby indicated Citizens' belief, based upon conversations with the OTS regulators, that this revised plan was "acceptable." Letter from Jerry L. Kirby to Lawrence B. Muldoon (June 28, 1990), PX 664. However, the FDIC considered that the plan still was incomplete and sought an increase in tangible capital of some $40 million. John A. Buchheid, who was a Supervisory Analyst with the FHLB–Cincinnati and the OTS in Cincinnati, wrote that, "[t]hrough a . . . series of

---

10. Mr. Muldoon agreed that Mr. Leonard's statement was a threat, and described it as the "use of a sledgehammer when a slap on the wrist would be in order." Tr. at 1895–96.

telephone conversations with the FDIC and Kirby, ... [it was] requested [that] Kirby submit an amendment to Citizens' re-filed capital plan demonstrating that a $40 million capital infusion/conversion could be implemented ...." John A. Buchheid, Memo to the Supervisory File (July 24, 1990), PX 675, at 2.

On August 2, 1990, the FDIC met with Messrs. Kirby and Vichich and Director Allen Hill about what would be required for the next capital plan. The OTS's own notes of this meeting reflect that, *inter alia*, Citizens' representatives were told that they needed "an outside capital injection at a minimum of approximately $40 million." Betty J. Mills, OTS, Memorandum to File (Aug. 8, 1990), PX 681, at 1. "[Mr.] Mangian stated that he would like the capital injection to occur as soon as possible ...." *Id.* Further, "this office wants to know that Citizens is on a plan of action and is moving forward, otherwise we will need to proceed with enforcement action to require a stock sale or acquisition." *Id.* at 2.

Mr. Kirby viewed this as a call for a mutual-to-stock conversion. Tr. at 516–18. Mr. Vichich took the FDIC's request as "gospel." Tr. at 1478. According to Mr. Buchheid, Citizens had no choice to ignore the OTS's or the FDIC's requests. Tr. at 4219. Under this pressure, Citizens submitted another capital plan on August 17, 1990. *See* Citizens Business–Capital Restoration Plan, 1990–1994 (June 15, 1990, revised Aug. 17, 1990), PX 690. This included a commitment to sell its Cincinnati division and to undergo a mutual-to-stock conversion. The OTS and the FDIC then strongly encouraged Citizens to sign a legally binding Consent To Merge Agreement, which Citizens signed on October 19, 1990.

In June 1991 Citizens sold its Cincinnati division to Banc One Corporation ("Banc One"). In January 1992 Citizens completed its conversion from a mutual to a stock organization, which raised $31.86 million in net funds. Plaintiff claims that these actions were taken due to the change in accounting treatment caused by FIRREA and the pressure of the regulators. Defendant disputes this causation.

## IV. *Testimony regarding causation*

Defendant argues that plaintiff's damages do not result from the breach, because, even absent FIRREA, Citizens would have sold its Cincinnati division and converted from a mutual to a stock company. Defendant offers several explanations for Citizens' actions, including the institution's unprofitability, poor management, prior plans for sale and conversion, and probable requirements imposed by bank regulators absent FIRREA. Defendant argues that these factors together interrupt any causative link. Even though plaintiff does not deny that "Citizens had problems other than its FIRREA-induced capital deficiency[,]" it argues that "the government's experts greatly exaggerate the extent of the problems." Pl.'s Br. filed Mar. 1, 2006, at 7.

The court has considered all of defendant's arguments carefully, including the extensive testimony on causation presented by all witnesses during both trials, as well as the documentary evidence. However, defendant did not convince the court, and plaintiff fully discharged its burden of proof. The court finds that Citizens would not have sold the Cincinnati division or converted in January 1992 absent the breach.

### 1. *Sale of the Cincinnati division generally*

Defendant argues that Citizens had planned to sell the Cincinnati division and, absent FIRREA, would have sold it at on or about the date of the actual sale. Defendant presented evidence that Citizens was considering the sale of the Cincinnati division before the submission of its final capital plan. Maurice J. Whalen, CPA, and former Director of Ellin & Tucker, Chtd., testified that Cresap Co., a management consulting firm hired by Mr. Kirby, advised the Board of Directors on April 20, 1990, that Citizens could reduce its costs by selling the Cincinnati division. Mr. Whalen stated: "[The Cresap report] alerts me that Cresap [Co.], being hired to help [Citizens] cut costs and improve profitability, was recommending in April of 1990 that the Cincinnati division be sold." Tr. at 4388. The August 24, 1990

report created by Kaplan, Smith & Associates, Inc., titled Preliminary Acquisition Findings of Citizens Federal Savings and Loan Association (the "Kaplan Smith Report"), also noted that Citizens was "considering a sale of all of the Cincinnati branch operations." PX 694, at 7.[11] David K. Mangian, Regional Director for Compliance and Consumer Affairs with the FDIC in Chicago, testified that Citizens had been considering the sale of the Cincinnati division since early 1990. Tr. at 3922.

Defendant also attempts to prove that Citizens would have sold the Cincinnati division absent FIRREA because the plan made sense as a fiscal matter. It argues that Citizens entered markets and absorbed products that the thrift did not understand. As Anthony Saunders, John M. Schiff Professor of Finance and Chairman of the Department of Finance at New York University's Stern School of Business, stated, "[t]hey moved into these new areas and really got burned." Tr. at 4852. Prof. Saunders testified that the Cincinnati division consisted of "expensive branches," Tr. at 4884, that "were not very profitable," Tr. at 4885. His opinion was that "it made absolute sense to get out of [the Cincinnati] market when [Citizens] did." Tr. at 4886.[12] Mr. Buchheid testified that Citizens was "losing money on Cincinnati and [there was an] immediate improvement of the capital position" when Citizens sold the Cincinnati division. Tr. at 4249. Haluk Unal, Professor of Finance at the University of Maryland's Robert H. Smith School of Business, observed in his expert report that "Citizens' conversion in January 1992 was a good business decision." DX 939, at 28. Prof. Unal testified: "Was Cincinnati beneficial to sell? ... I mean, [Citizens] doesn't need a PhD in economics to understand what the differences are. It is clear here that any investor could make an inference that Cincinnati was a good decision." Tr. at 4687.

To combat this testimony about what should have been done, plaintiff submits testimony of what the management and regulators said that Citizens actually intended to do. Mr. Kirby testified that, as of January 4, 1990, the time of the submission of Citizens' first capital plan, Citizens had no intention of selling the Cincinnati division. Tr. at 474, 476–77. They only considered the sale "as a contingency plan" in the wake of FIRREA, because "we were certain we were not going to fail. And I ... told the regulators, both [the OTS and FDIC], we would do anything necessary to survive, just tell us what you want." Tr. at 947. Mr. Vichich also testified to this effect. He was asked:

> Q. Had the bank made any decision that it was going to sell the Cincinnati branches [as of December 1989]?
>
> A. No.
>
> Q. Were there any plans to sell the Cincinnati branches at the same time as it was going to sell the Columbus branches?
>
> A. No.

Tr. at 1429. Mr. Vichich was also asked:

> Q. If FIRREA hadn't taken away your goodwill, do you believe the bank would have sold the Cincinnati division?
>
> A. No, I don't.

Tr. at 1434. Even defendant's witness, Mr. Buchheid of the OTS, testified that Citizens decided to sell the Cincinnati division in order to regain capital compliance. Tr. at 4247.

All the evidence presented by defendant to prove that Citizens would have sold Cincinnati post-dates the 1989 implementation of FIRREA. Defendant's evidence proves, at most, that, after the breach but before regulatory pressure was applied, Citizens was considering the option of selling the Cincinnati division in order to raise capital and that several expert economists consider that to have been a sound strategy even absent the breach.

---

11. However, it should be noted that Mr. Kirby and Citizens' Board of Directors never saw the Kaplan Smith report. Tr. at 4888.

12. Prof. Saunders qualified this statement by explaining that he was putting himself in the shoes of the bank, making "an ex ante decision." Tr.

at 4887. "I mean, I'm not—we talked about crystal balls before, and we didn't know there would be a big turn around in the economy after 1991. We didn't know that interest rates would fall." *Id.*

Nonetheless, consideration is not action, negotiations are not sales, and absent the breach it would have been Citizens' decision whether such a sale made economic sense, not the decision of defendant's experts. The court instead credits the testimony of Messrs. Kirby and Vichich and other witnesses for Citizens who testified consistently and credibly that Citizens would not have sold its Cincinnati division absent the breach. What defendant's experts believe might have "made sense" in theory is not persuasive when weighed against what the bank President, Mr. Kirby, testified he would have done. The court also notes Mr. Kirby's testimony that Citizens re-entered the Cincinnati market in 1994 by purchasing several branches in the area. Tr. at 557–60.

The documentary evidence concerning Citizens' efforts to gain approval of a capital plan reinforces this conclusion. As mentioned above, after the implementation of FIRREA Citizens was required to submit a capital plan that would chart Citizens' progress to full compliance with the regulatory capital requirements. The first, second, and third versions of this plan did not include the sale of the Cincinnati division. Not until the FDIC had imposed lending restrictions, threatened to shut the thrift down by pulling its deposit insurance, and asked Citizens specifically to create an "outside capital injection at a minimum of approximately $40 million," Betty J. Mills, OTS, Memorandum to File (Aug. 8, 1990), PX 681, at 1, did Citizens finally agree in its fourth capital plan, dated August 17, 1990, to sell its Cincinnati division. See PX 690. These are not the actions of an institution that was self-motivated to sell its branch offices. Even the OTS, in its November 25, 1991 regulatory plan, stated that "the Cincinnati area branches were sold to Banc One Corporation in June 1991 due to the capital requirements imposed by FIRREA." PX 779, at 3; see also Tr. at 1933–34

(Mr. Muldoon stating that PX 779 was a regulatory plan created by OTS).

The court finds that Citizens would not have sold the Cincinnati division if it had not been compelled to do so in order to raise capital, nor would Citizens have needed to raise capital but for the breach. The FDIC's regulatory pressure made this sale all but required.

### 2. Conversion from a mutual to stock company generally

It is undisputed that Citizens wanted to convert from a mutual to a stock company at some point, although the parties dispute the timing. Citizens converted in January 1992. Plaintiff argues that this date was earlier than it wanted and occurred during a bad market for thrift conversions. Defendant counters that the market for conversions was strong and that Citizens would have converted in January 1992 in any event. Prof. Unal wrote that, "[T]he financial condition of Citizens was so weak that Citizens had no choice but to take steps to improve the financial condition of the institution and convert in January 1992 even if it had been able to include goodwill in regulatory capital." DX 939, at 28. At trial, Prof. Unal testified that, "Well, January of 1992, there were ... reasons why it made sense for Citizens to convert. One is it was-its financing, its problems were at such a level that it needed to convert. Its financial condition required it to convert." Tr. at 4590.[13] Prof. Unal testified that, "[I]t is really a no-brainer to see that [the last quarter of 1991 and the first quarter of 1992] was a great time to convert, as certified with the thrifts that decided to convert and did convert." Tr. at 4622. Also, Mr. Kirby had testified in 2003:

> [W]here we had been told in '86 and '89 when we were considering conversions that we should have two to three years of good operating-consistent and good operating

---

**13.** Prof. Unal qualified this statement by saying:
> Well, I should admit that I haven't made a thorough analysis to answer that question [whether, even including goodwill, Citizens' balance sheet was weak enough to require a January 1992 conversion]. What I did is I looked at the subscription prospectus and looked at what Citizens' management was telling the whole world, and I put myself [in the position of] an individual who is contemplating to buy stock in Citizens.
> And from that description, I have concluded and reached an opinion that Citizens needed to convert.
> Tr. at 4591.

earnings, we were now going into the market after being able to accomplish three quarters. And that's what the investment bankers told us, under no circumstances could we take you public unless you had three consistent quarters, as opposed to three consistent years, in a good market. Tr. at 533. The 1992–1994 Business Plan indicates this condition-three consecutive quarters of profit-had occurred at the time of the January 1992 conversion.

Plaintiff introduced impressive evidence that Citizens would not have converted in January 1992 absent the breach. Mr. Kirby testified that he had been advised by investment bankers in 1986 that Citizens should not convert until it had two or three consecutive years of positive earnings. See Tr. at 482, 533. Mr. Kirby stated that Citizens did not anticipate converting until after 1992. Tr. at 482. Citizens did not wish to convert "[u]ntil later years, when the markets had improved." Tr. at 497. Citizens maintained this position until sometime after the third capital plan was submitted in June 1992. See Tr. at 500–01. Mr. Vichich also testified that the thrift had no interest in converting when conversion proceeds would be so low. Tr. at 1430–31.

Plaintiff contends that the FDIC imposed the conversion as a condition for accepting Citizens' capital plan and that Citizens was required to file that capital plan as a result of the breach. The OTS itself notified Citizens that "we believe Citizens will fail one or more of the new capital requirements. As a result, the association will be required to submit a capital restoration plan to this office by January 8, 1990." Report of Examination (Nov. 13, 1989), PX 573, at 4.

While it may be true that 1992 was a good time to convert, absent the breach the decision was Citizens' to make. The court finds that Citizens would not have converted in early 1992 but for the breach and the pressure of the regulators. Mr. Kirby testified that Citizens ideally wanted two or three years of operating profits before taking Citizens public. The court credits this testimony and does not view it as inconsistent with Mr. Kirby's statement that, when under regulatory pressure to convert, investment bankers

told him that Citizens required three consistent quarters of profits. From the context the court understands that Mr. Kirby was speaking of what would be required for the conversion to succeed. Under regulatory pressure, he had abandoned his attempts to maximize the profits of a conversion and settled for any successful conversion. The court also credits the testimony of Mr. Vichich that the conversion would not have occurred during an economic climate that would have produced such a relatively low amount of conversion proceeds.

Similar to the sale of the Cincinnati division, Citizens had submitted three capital plans that did not suggest conversion. Only after threats from the regulators and the imposition of lending restrictions did Citizens agree to convert. Indeed, the first three versions of its capital plan-two full plans and one amendment-expressly stated that "conversion is not anticipated" at this time. PX 598, at 8; PX 611, at 8; PX 660, at 9. This was because, as Mr. Kirby explained, "The market was just miserable at the time. No one, no investor in their right mind, would have bought thrift stock." Tr. at 481. Once again, the testimony of Citizens' executives, such as Messrs. Kirby and Vichich, is consistent and compelling: Citizens would not have converted in January 1992 absent the breach. Combined with the documentary evidence expressing the intent of Citizens, plaintiff proved that Citizens would not have converted in January 1992 absent the breach.

3. *Effect of regulatory pressure on Citizens even absent the breach*

Defendant contends that FIRREA did not cause the breach because regulatory pressure would have remained the same absent the breach. This argument has two threads. First, "Citizens would have had to file a capital plan in the absence of the breach because FIRREA's risk-based requirement would not have been satisfied even if all supervisory goodwill had been counted as regulatory capital." Def.'s Br. filed Mar. 1, 2006, at 4. Second, "[w]hile Fifth Third attributes the sale of Cincinnati and the 1992 conversion to regulatory pressure, the same

pressure would have existed in the absence of the breach." Id. at 8.

Defendant argues, and plaintiff admits, that even "absent the breach, Citizens ... would still need to come into compliance with the new risk-based requirements." Pl.'s Br. filed Feb. 24, 2003, at 41. If goodwill had been permitted to be counted, plaintiff would have been in compliance with the new tangible and core capital requirements, but not the risk-based capital requirement. Defendant therefore argues that Citizens would have been forced to file a capital plan even absent the breach and consequently would have been subjected to the same regulatory pressures.

Plaintiff's key damages expert, Dr. Brumbaugh, senior finance fellow at the Milken Institute, concurs to the extent that Citizens was venerable with respect to the risk-based capital requirement. He calculated that, absent the breaching provisions of FIRREA, Citizens quickly could have achieved compliance with the risk-based requirement through purchasing recourse insurance by December 1989,[14] instead of in June 1990. Expert Report of R. Dan Brumbaugh, PX 1486, at 26. Dr. Brumbaugh testified:

> If [Citizens] had been allowed to count the goodwill, the big problem that it had [with the risk-based capital requirement] was that it had sold $800 million worth of mortgage loans with recourse, which meant that, if those loans ceased to perform, Citizens would be responsible for whatever losses ultimately resulted.
>
> Basically ... the only thing that they had to do to come into capital compliance was to purchase, as they did do, what is called recourse insurance. That would have brought them into capital compliance....
>
> [T]hey could have come into capital compliance with risk-based relatively easily.

Tr. at 2462–63. The court credits this analysis.

Focusing primarily on tangible capital, Mr. Mangian testified that in 1990, even absent FIRREA, the FDIC would have given Citizens a failing score on its annual report.

The FDIC reports are "based upon what's there in capital protection, given the risk of the association. So I don't believe that FIRREA changed that dynamic." Tr. at 3851–52. In Mr. Mangian's view, Citizens needed higher tangible capital levels, even absent FIRREA, "based upon the risk that was presented." Tr. at 3736–37. Mr. Mangian argued that the FDIC's focus always was on tangible capital because "[w]hat protects us from failure is tangible capital." Tr. at 3737. Goodwill did not protect the FDIC against loss in its role as insurer. "Therefore, even if FIRREA had not imposed new capital requirements, in its role as insurer, the FDIC would have focused upon the level of tangible capital in relation to the risk that the institution presents to the deposit insurance fund." Def.'s Br. filed Mar. 1, 2006, at 9 n. 2.

This argument is unavailing. Even if the court were to assume that the FDIC, as the tough new regulator, would have focused on tangible capital levels where its predecessor did not, the fact is that Citizens formed a contract with the Government for special accounting treatment. In the context of the Winstar cases, FIRREA breached Citizens' contract with the Government by removing the ability to count goodwill toward regulatory requirements. Defendant conveniently posits a scenario where FIRREA did not exist to breach the contract and remove goodwill from the capital requirements, but, instead, the FDIC decided on its own to threaten Citizens with removal of insurance and, thus, insolvency if it did not raise its tangible capital levels relative to goodwill.

Had this scenario transpired, it also would have constituted a breach of contract by the Government. The breaching activity would have occurred through a different mechanism-the regulator's choice to eliminate the promised treatment of goodwill-rather than a mandate from Congress eliminating the treatment of goodwill. Defendant's speculative scenario does not even appear to illuminate causation; rather, it imagines a different sort of breach. Citizens' contract with the Government specifically allowed it to

---

**14.** FIRREA went into effect on December 7, 1989.

count large amounts of intangible capital towards its regulatory requirements, which, combined with the economic conditions in the thrift industry, all but guaranteed a sharp decrease in tangible capital ratios. The Federal Government knew, or should have appreciated fully, the accounting construct that FIRREA had created. Allowing the Government later to claim that a new regulator, the FDIC, could move to remove a thrift's insurance based on the low tangible capital ratios that the Government encouraged and contracted to create is both counterintuitive and unfair and lays the predicate for a breach.

In any event, the court also is not convinced that, absent FIRREA, the FDIC would have asked Citizens to fortify its tangible capital levels. Defendant's hypothetical world assumes that, even without FIRREA, the anti-goodwill FDIC would supplant FHLBB as the regulator of thrifts. However, the weight of the evidence does not support the proposition that a different regulator would have treated goodwill differently than the previous regulator had treated it. Arthur Lee Lassiter, formerly a Supervisory Agent with the FHLBB–Cincinnati and a Deputy Director with the OTS both in Cincinnati and in Washington, DC, testified that, although he was concerned about the tangible capital levels of institutions, he could not include them in FHLBB's viability analysis.[15] See Tr. at 4039. Even defense counsel, in his opening argument, admitted that "[t]he Government, at least this representative of the Government, does not dispute that there may have been a change in attitude. The whole idea of FIRREA ... was that the way we try to grow out of the problem didn't work, we've got to get tougher ...." Tr. at 4568. It took a directive from Congress–FIRREA–to change the regulators' treatment of goodwill. Absent this directive from Congress, the record does not support a finding that the FDIC would have been as rigorous with the thrifts.

### 4. Allegations of mismanagement

Defendant attempts to prove that Citizens' failure to meet regulatory capital requirements was caused, at least in part, by mismanagement of the thrift, not FIRREA. Among the litany of small problems that defendant points to (all of which the court has considered), two received the most dedicated energy: the sale and leaseback of Citizens' office space, and the poor management scores given Citizens in FDIC evaluations during the late 1980's.

Defendant criticizes Citizens' management for signing a long-term lease for prime office space in Dayton at a rate that started at $20.85 per square foot, or $2 million per year. Plaintiff responds that, in 1987, this was a reasonable price and that it only appears high in retrospect because the housing market in the area fell.

As further evidence of poor management, defendant also points out that in its 1990 evaluation, the FDIC rated the thrift a "5," which suggests "an extremely high immediate or near term probability of failure." FDIC Report of Examination (Mar. 24, 1990), PX 623, at 1–a–1. The record shows that FHLBB, the predecessor regulator, consistently had given Citizens 1's and 2's on its management scores during the pre-FIRREA period of supervisory mergers and composite bank scores of mostly 1's and 2's, as well. See Supervisory Profile (June 30, 1990), PX 666, at 1. Furthermore, these scores were received during the late 1980's, a period of "thrift industry crisis." Fifth Third VIII, 402 F.3d at 1224.

The court carefully has considered all of defendant's evidence of poor management and weighed it against the explanations provided by witnesses for Citizens, bank regu-

---

15. Mr. Lassiter testified:
 Q. Where is there any mention of tangible capital ... in [the report] ...?
 A. It's not there. What we did, though, is following the guidelines from the board as to what is supposed to be in a digest and using the board's viability analysis, their program that was sent to us, we followed the procedures and the recommendations based on that.

 ....
 Q. So it's your testimony that the reason that [the report] doesn't make any reference whatsoever to tangible capital is because that was ... the position of the Federal Home Loan Bank in Washington, D.C.?
 A. We were following the application guidelines of what had to be reviewed.
 Tr. at 4038–39.

lators, and the documentary record. Contrary to the innuendos of defendant, the court finds Citizens' management team to have been quite skilled. After the first trial, this court credited Mr. Kirby, Citizens' President, Chief Executive Officer, and Chairman of the Board, as "an intelligent and highly competent businessman," *Fifth Third VI*, 56 Fed.Cl. at 693, a "gentleman and person of integrity," *id.* at 674, and "an admirable incantation of the American dream," *id.* Mr. Kirby was at the helm of Citizens' management team, and the court's opinion of him as a banker remains unfazed.

More specifically, the court finds that the management team made a reasonable decision under the circumstances when it signed Citizens' long-term lease for the Dayton office space. The FDIC's poor ratings of management would be more troubling if they were not set against a history of good ratings both before FIRREA and after the thrift had come back into capital compliance. The court finds that the FDIC ranked the management lower more because of the performance of the thrift rather than the performance of management. At that time, the thrift's management was grappling with a difficult situation due to the breaching provisions of FIRREA and must be granted a certain amount of latitude. The management of Citizens certainly was not poor, and what mistakes it did make contributed minimally to Citizens' failure to meet the new capital guidelines.[16]

### 5. *Lack of profitability*

Defendant contends that Citizens was unprofitable and would have sold the Cincinnati division and converted in January 1992 even absent FIRREA in order in order to return to profitability.[17] Mr. Leonard testified regarding the FDIC's findings on Citizens'

profitability. Citizens' net operating income had declined from .57% of average assets in 1987 to .02% in 1988. In 1989 it was negative. Interest expenses had increased between 1987 and 1989, which reduced the net-interest margin and thus the profits that the thrift could make on loans. Mr. Leonard gave his opinion that it is very difficult for a thrift to improve earnings in an environment with a declining net-interest margin. Likewise, the FDIC concluded that "[w]ithout proper restoration of capital, this institution represents a danger to the insurance fund" due to its risk of failure. Supervisory Profile (June 30, 1990), PX 666, at 2.

It is defendant's position that the sale of the Cincinnati division and the January 1992 conversion allowed Citizens to return to profitability. Mr. Buchheid testified that the sale of the Cincinnati division "improved profitability because [Citizens was] losing money on Cincinnati ...." Tr. at 4249. With respect to the conversion, defendant also presented evidence that the stock conversion raised profitability because Citizens needed the capital. Prof. Unal stated:

> [A] mutual institution ... needs to convert the most when it needs capital most, because that would be the best, you know, impact that one can think of on the thrift, if you're improving.
>
> So the question is did Citizens need capital ... So if it needed capital, then the sooner the better.

Tr. at 4589.

Plaintiff agrees that Citizens was not profitable in 1990 and 1991. *See* Pl.'s Br. filed Mar. 1, 2006, at 3 n. 5. Yet, Mr. Kirby testified that, before FIRREA, Citizens maintained a capital "cushion"-an amount of extra capital above the regulatory minimum-and could have weathered any temporary profitability problems. Tr. at 422-23.

---

16. All of defendant's accusations of poor management appear to have had minimal effect compared to FIRREA. For example, even if one assumes that the $2 million-per-year lease was an unreasonable amount to pay, it appears a minor element in relationship to the $53.7 million by which Citizens missed the risk-based capital requirement, and even smaller when compared with Citizens' approximately $2.4 billion asset base. Citizens' other alleged problems, including top-heavy management left over from the

integration of new branches and $66,000.00 in "excessive" executive compensation, also were minimal contributors. The court has absolutely no doubt that the 600–pound gorilla in this case was FIRREA and its elimination of goodwill.

17. These contentions of unprofitability run through most of defendant's arguments on causation.

In addition, plaintiff showed that the Cincinnati division soon would have returned to profitability. Mr. Whalen agreed that in 1986, after two years of losses, the Cincinnati division turned a small operating profit. Tr. at 4379. Mr. Whalen and Prof. Saunders both admitted that an acquired company sometimes takes a few years to turn a profit. Tr. at 5216, 5435–36. Plaintiff's expert Christopher James, a William H. Dial/Suntrust Eminent Scholar in finance and banking, also testified at the 2003 trial:

> Multidivisional companies, or companies that have regional operations, oftentimes find themselves with regional operations having differential rates of earnings. You know, I'm a car buff, so I know that Ford ... makes more money on its SUVs than it does on its sedans. And in usual years, they continue to make sedans because they add incrementally to profits.

Tr. at 2160. In addition, Mr. Muldoon, Citizens' primary regulator for much of the period in question, was of the view that Citizens could have come into capital compliance with FIRREA and regained profitability through means other than the sale of Cincinnati or stock conversion. He testified:

> I do believe they could have, that they would have [accomplished capital compliance with FIRREA by shrinkage and additions to capital through earnings]. Citizens had shown themselves to be, over a long period of time, cooperative in their efforts to do what the regulators wanted and they were not only cooperative, they were able, in most cases, to deliver. They did have some ... smaller problems in the last part of the '80's that needed to be taken care of.
>
> But given the history and my experience with them, I believe they could have worked that out.

Tr. at 1879.

The court finds that, absent the breach, Citizens would not have sold the Cincinnati division or converted in January 1992 in order to increase Citizens' profitability. Again, the court relies on the consistent testimony of Mr. Kirby and other executives of Citizens that they would not have sold Cincinnati and would not have converted at that time. This is reinforced by the capital plans that Citizens submitted, as discussed above.

This finding also is consistent with the historical circumstances. Defendant's experts appear to argue that, because the Cincinnati division was, at the time, losing money, it was obvious that the division should be sold. However, if it were that simple—that divisions losing money should be sold because they are a drag on the company—no one would buy them. Prof. Saunders and Mr. Whalen both agreed that some properties must lose money for a time before they can become profitable. Citizens intended to bring the Cincinnati division around to profitability over a period of time. Certainly, this is what the purchaser of the Cincinnati division, Banc One, also intended for the branches. Lending indirect support to the feasibility of Citizens' bringing the Cincinnati division to profitability is that it did become profitable in the hands of Banc One. Furthermore, economic conditions for thrifts improved in the mid-to-late 1990's, just as Citizens had hoped that they would. Defendant's economic experts might not have wagered on this improvement, but Citizens was entitled to do so. In addition, Prof. Unal's contention that any successful conversion for a bank that needs capital is a good conversion goes against common sense. If a hypothetical bank could raise an extra $30 million for the same assets by waiting an extra year to convert, it stands to reason that a degree of reasonableness would inhere in waiting.

Citizens had issues with profitability, but would have managed them by cutting costs and improving earnings as it waited for thrift economic conditions to improve. The Government's breach caused the sale of the Cincinnati division and precipitated the conversion.

## V. *Testimony regarding foreseeability*

Defendant argues that any damages caused by the sale of the Cincinnati division and the premature conversion were unforeseeable to the regulators at the time of the contract. Plaintiff rejoins that not only were they foreseeable, but the regulators actually foresaw them.

1. *Foreseeability of damages caused by the sale of the Cincinnati division*

According to defendant, the Government could not have foreseen, at the time of the contract, that the sale of the Cincinnati division would have caused plaintiff damages. This is because the regulators could not have known that the Cincinnati division would be profitable or would appreciate in value. Def.'s Br. filed Mar. 1, 2006, at 17.

Plaintiff disagrees, arguing that not only were the damages foreseeable as a matter of law, the regulators actually foresaw them. The regulators understood that anything that brought Citizens out of capital compliance would subject it to regulation. Mr. Muldoon, the primary regulator for Citizens, testified that his office performed detailed viability analyses of Citizens' proposed mergers. Tr. at 1767–68. These involved studying the combined resulting balance sheets, including goodwill, for Citizens and the bank with which it sought to merge. Mr. Muldoon stated that the regulators would not allow a merger that would put the resulting bank out of capital compliance, because "[w]e felt that we would have just been postponing another problem . . . if they had not met our capital requirements, . . . we would have been taking action against them immediately after the transaction . . . ." Tr. at 1768–69. The regulators were also aware that, once an institution was out of capital compliance, the main methods of raising capital were conversions and sales of assets. Mr. Lassiter, as an FHLB and OTS regulator, admitted that he knew in the early 1980's that capital-deficient institutions often sold branch offices or converted in order to raise capital. Tr. at 4008–11. Further, Mr. Muldoon, at least, believed the thrift could regain profitability. Tr. at 1879.

The court finds that these damages were foreseeable by a prudent regulator, as examined in more detail in the legal discussion. The court believes the regulators knew exactly what would happen if the goodwill were removed: capital non-compliance followed by enforced capital-raising measures, such as conversions and the sale of assets. They understood such regulatory measures could go against the business plan of Citizens and

could cause it damages. Therefore, the court also finds that the regulators actually foresaw these damages.

2. *Foreseeability of premature conversion damages*

Defendant argues that it was not foreseeable to the regulators that forcing Citizens to convert earlier than it intended would cause Citizens any damages. The regulators did not have a "crystal ball" that could tell them the conversion market would go up after 1992 and that therefore plaintiff would earn less conversion proceeds. Def.'s Br. filed Mar. 1, 2006, at 16.

Plaintiff disagrees, arguing again that the damages were foreseeable and, in fact, actually foreseen. As the court found regarding the foreseeability of damages caused by the sale of the Cincinnati division, the regulators were aware that if an institution fell out of capital compliance, it would be subjected to regulatory enforcement, *See* Tr. at 1768–69 (Mr. Muldoon), and that in order to raise capital, the thrift would probably need to sell assets or convert, Tr. at 4008–11 (Mr. Lassiter). Further, the regulators recognized that the timing of a conversion could affect its proceeds. Mr. Lassiter testified:

Q. Isn't it also the case, Mr. Lassiter, that over the past 20 years, there have been times when it has been particularly advantageous to issue stock in a mutual thrift conversion and times when it hasn't been particularly advantageous to do that?

. . . .

A. Yes, yes.

Q. And one of the factors that affects that is what the stock market is doing, isn't that right?

A. I think any kind of stock, be it thrift, bank or any corporation going to market, there's a timing issue.

Tr. at 4012.

The court determines that these damages were foreseeable by a prudent regulator, as discussed in more detail in the legal section. The court also finds that the actual regulators, e.g., Messrs. Muldoon and Lassiter, understood that the withdrawal of goodwill would render Citizens out of capital compli-

ance, subjecting it to regulatory enforcement and a possible forced conversion to raise capital, which, if the timing were poor, could reduce the conversion's proceeds. Thus, the court finds actual foresight existed.

## VI. *Testimony regarding damages*

Plaintiff seeks the proceeds lost due to the premature conversion of Citizens from a mutual to a stock corporation, in addition to damages from the forced sale of Citizens' Cincinnati division. Defendant disputes that plaintiff was damaged at all or, if it was, that these damages were proved sufficiently. In the alternative, however, defendant argues for various reductions in damages.

### 1. *Defendant's contention that plaintiff was not damaged*

Even if the breaching provisions of FIRREA did cause the sale of the Cincinnati division and the premature conversion, defendant postulates that these actions caused Citizens no damages whatsoever. Instead, they actually helped Citizens to return to profitability. As Prof. Saunders put it, "to blame the government ... is extraordinary." Tr. at 4884. The court finds this argument implausible and not supported by the factual record.

#### 1) *Sale of the Cincinnati division*

Defendant posits reductions in damages to the sale of the Cincinnati division that, it urges, result in zero damages. Because these are reductions in plaintiff's model, they are discussed separately below.

#### 2) *Conversion from mutual-to-stock*

Defendant presented expert evidence intended to demonstrate that the reduction in proceeds from the premature conversion of Citizens from a mutual to a stock company cannot be considered as damages. To this end defendant advanced Profs. Unal and Saunders, both talented economists of renown.

Defendant allows that, if the forced conversion from mutual to stock company had failed, i.e., the stock of the company had not sold, plaintiff would be damaged. As this was a successful conversion, however, no damages were sustained. Prof. Unal opined

that "it was a very successful conversion because they completed a conversion for a firm which needed to convert and, you know, which was not well capitalized. So it was one of the most successful conversions I could point out among many conversions I have analyzed." Tr. at 4604. Defendant also cites the statement of Mr. Kirby, who said, that, while he wished the proceeds would have been greater, "in the real world, because of the condition of the market and that it had to be accomplished in a short period of time, I was happy we were able to accomplish the [initial public offering]." Tr. at 533.

To the extent that the conversion was successful, defendant regards the exact amount of proceeds realized to be irrelevant. "Unless there are clearly defined investment opportunities the thrift must forgo because of a lack of equity, it will suffer no injury from reduced conversion proceeds." Def.'s Br. filed Mar. 1, 2006, at 31. Defendant and its experts analogized the proceeds of a stock conversion to the proceeds of a loan. As Prof. Unal testified, "It's like, you know, the same as borrowing. Like I would have borrowed 500 more, I borrowed less. Well, what would you have done with that money? Well, I would have invested it, it would have made some returns. That's what you are preventing me to earn." Tr. at 4587. In his opinion, if a bank promised, but then refused, to lend a borrower a certain amount of money, the damages would not be the amount of the promised loan, but, rather, the value of the investments the borrower could have received by leveraging the loaned monies. *See* Tr. at 4587–88.

Profs. Unal and Saunders view conversion proceeds as a liability that must be paid back to the shareholders. Prof. Saunders testified that when a thrift issues equity, "[b]oth sides of the balance sheet have expanded ... and reflecting the new equity issuance is an adjustment to ... the liabilities side, recognizing that when I raise equity, I have a liability, an obligation to the investors to pay them [back their contribution]." Tr. at 5011. Prof. Unal agreed that "this was neither an asset sale nor a charity contribution. Those people who [were] paying this $65 million

[are] expecting what? Some future return." Tr. at 4576.

Additional proceeds mean additional shares, a higher price per share, or both. Plaintiff's expert Ronald S. Riggins, an expert in valuation appraisals for mutual-to-stock conversions, submitted a report that modeled the hypothetical 1993 conversion and its resulting proceeds and subsequently revised it. Expert Report Pertaining to Conversion Valuation, PX 1487; Rebuttal Report Pertaining to Conversion Valuation, PX 1498; Conversion Proceeds with Only Cincinnati Retained (Revised), PX 1610; Conversion Proceeds with Only Cincinnati Retained (No Profits From Cincinnati), PX 1611. He concludes that a 1993 conversion would have raised $65 million by issuing 6.5 million shares at $10.00 per share. Rebuttal Report Pertaining to Conversion Valuation, PX 1498, Ex. C at 2. The actual conversion in 1992 raised $36.225 million by issuing 4.025 million shares at $9.00 per share. Expert Report Pertaining to Conversion Valuation, PX 1487, Ex. 6 at 2. If the Government were forced to pay damages in the instant case, Prof. Unal testified that plaintiff should be forced to issue the additional 2.457 million stock shares, lest plaintiff receive a windfall. Tr. at 4576–77. "[Y]our Honor, if you decide to ... ask the government to pay the difference, then in order to make the firm bound, you have to ask Citizens to issue that extra number of shares .... Unless you make the firm issue those extra shares, then you're not being fair." Tr. at 4577.

Plaintiff argues that because shareholders receive an ownership interest in the thrift, the sale of stock is analogous to a sale of property, not a loan. Payment of dividends is not required. "Simply put, no amount of academic legerdemain can convert equity to debt." Pl.'s Br. filed Mar. 1, 2006, at 11. Mr. Riggins testified that corporations have no obligation to repurchase shares or pay dividends. Tr. at 5293. He also noted that several thrifts in Citizens' Peer Group do not issue dividends. *Id.* Both Profs. Saunders and Unal admitted that converted thrifts, as a rule, were not obligated to pay dividends. Tr. at 4713, 5215. More specifically, Citizens' conversion prospectus for the sale of its stock never mentions a requirement to pay dividends, or any liability or debt to shareholders. *See* Prospectus, CitFed Bancorp, Inc. (Jan. 22, 1992), DX 561. It is Prof. Saunders's view that, because equity appears on the right-hand side of a balance sheet, it is a liability. Tr. at 5009–11. Plaintiff deems this "nonsense," Pl.'s Br. filed Mar. 1, 2006, at 10, that ignores the fundamental arithmetic of accounting. As Mr. Riggins testified, equity is not a liability, but is defined mathematically as the amount that remains once one has subtracted liabilities from assets. Tr. at 5319. Prof. Unal admitted that "[t]his is an equity issuance. It's not a debt issuance ...." Tr. at 4694.

Profs. Unal and Saunders are intelligent men and skilled economists. However, their argument is mired in economic theory. Inevitably the court must weigh their theoretical testimony against the practical experience of Mr. Riggins, who, though he possesses no doctorate in economics, has specialized in thrift appraisals and conversions, with clients both from the private sector and the Government.[18] Prof. Unal has a fundamental disagreement with the formal appraisal process mandated by the Government and used by Mr. Riggins. It is difficult to separate Prof.

---

18. Duels of experts, especially economic experts, often end badly. As one litigator put it:

> Based on my pre-academic life as a corporate litigator, I have my doubts about whether *any* dispute should be resolved solely on the competing testimony of economic experts. This view is not the result of doubts about the value or merit of economic testimony. Rather, in my experience it is not hard to find credible-sounding experts on both sides of most economic issues, and I do not think that legal decisionmakers are particularly well-equipped to decide which of two competing economic experts is correct.

Barros, D. Benjamin, *At Last, Some Clarity: The Potential Long–Term Impact of Lingle v. Chevron and the Separation of Takings and Substantive Due Process*, 69 Albany L.Rev. 343, 347 n. 22 (2005). While not an economist, the undersigned is schooled in expert testimony, *Winstar* cases, and credibility of experts in *Winstar* cases. Defendant's esteemed experts were admittedly more theoretical than plaintiff's. For example, Mr. Riggins, whom plaintiff retained as an expert, has performed over 200 appraisals. He can read a balance sheet.

Unal's criticisms of Mr. Riggins's approach in particular from his disapproval of the system as a whole. It is inappropriate for the expert to undermine the conceptual validity of the government-mandated guidelines that Mr. Riggins followed. The court has taken this into account when weighing Prof. Unal's testimony.

The court finds that stock is equity, and not debt-on this the parties seem to agree. There may be an expectation that a corporation will pay dividends, and the shareholders might take action if the corporation does not, but no formal obligation mandates it to do so. More specifically, Citizens' conversion prospectus does not mention a requirement to pay dividends. The court finds no obligation on the part of Citizens to pay dividends.[19]

## 2. Damages associated with the forced sale of Cincinnati division

Dr. Brumbaugh created a model with which damages from the loss of the Cincinnati division could be measured. First, Dr. Brumbaugh restores to Citizens the assets that it lost allegedly due to the breach, including $341 million in deposits and $59 million in deposit "runoff" allegedly caused by the breach. Based upon this restored asset total, Dr. Brumbaugh then calculates lost profits for the Cincinnati division between 1992 and 1998. To do this, Dr. Brumbaugh estimates the percentage profit the Cincinnati division would have made from these assets by adjusting downward the percentage profit that the Dayton division made on its own assets. Dr. Brumbaugh then multiplies this adjusted rate by the $400 million to get the lost profits from 1992 to 1998.

Next, Dr. Brumbaugh calculates the lost profits of the Cincinnati division from 1998 forward. As a measure of these profits, he uses the deposit premium that Citizens would have received from Fifth Third, if Citizens still had possessed the Cincinnati division and had sold them to Fifth Third along with its other assets. He then subtracts from this amount the profit on the Cincinnati deposits that Citizens received when it sold the Cin-

cinnati division to Banc One. Finally, he adds back the carrying cost of cash, a miscellaneous expense that Citizens incurred during the sale to Banc One.

### 1) Restoration of assets to Citizens

When Citizens sold the Cincinnati division, it transferred $341 million in assets to the purchaser, Banc One. Dr. Brumbaugh restores $341 million to Citizens. Dr. Brumbaugh then restores an additional $59 million in assets to account for the loss of deposits, or "runoff." This runoff, as Mr. Vichich convincingly testified, was caused by the post-FIRREA lending restrictions placed on Citizens due to its inability to meet regulatory capital requirements and word on the street about the sale of the division. Tr. at 1457–59. When commercial entities could not obtain loans from the bank due to the restrictions, they withdrew their deposits. See id. at 1459. Dr. Brumbaugh agreed with Mr. Vichich's testimony. Tr. at 5446–50.

Defendant challenges the restoration of $59 million in deposits to Citizens because Citizens was shrinking rapidly even before the enactment of FIRREA. Prof. Saunders presented a graph to demonstrate the lack of a relationship between the $59 million runoff and the events of the breach. See Brumbaugh's Lost Profits Claim Is Flawed and Unreliable: The Deposit Runoff in Cincinnati Started Before the Consent To Merge, DX 4224. This graph shows a runoff of approximately $27 million prior to the breach, between December 1987 and May 1990 (when the lending restrictions began). According to defendant, the runoff did not increase due to the lending restrictions or the announcement of the sale, but merely continued apace. Elimination of this runoff reduces the assets restored to the $341 million transferred to Banc One, thereby reducing plaintiff's damages by roughly $2 million.

Plaintiff responds that Black Monday, a stock market crash that occurred in October 1987, indirectly caused the steep pre-breach runoff. Prof. Saunders admitted that this crash caused a "flight to banks;" in other

---

19. This does not settle the issue of whether conversion proceeds may be considered dividends, which is discussed separately below.

words, people took their money out of stock and put it into bank deposits. Tr. at 5228. Thus, Citizens' deposits had reached an artificial high before the end of 1987. The amount of runoff at the end of 1987 was almost exactly equal to the increase in deposits caused by Black Monday, testified Dr. Brumbaugh, Tr. at 5443–44, who presented his own demonstrative exhibit to this effect. *See* Citizens' Cincinnati Division Deposit Levels, PX 5001; Citizens' Divisional Deposit Growth Indices, PX 5002.

The court agrees with plaintiff that the 1987 runoff was caused by the temporary increase in deposits due to Black Monday and the subsequent loss of deposits as investors changed their investments back to stock. This isolated event should not be interpreted as a trend. The court also agrees that the $59 million in post-breach runoff was caused by the breach and, most importantly, its loan restrictions. Therefore, plaintiff's model can progress with $400 million total in assets associated with the Cincinnati division.

### 2) *Calculation of lost operating profits between 1992–1998*

As described more precisely below, Dr. Brumbaugh's attempt to demonstrate the lost profits of the Cincinnati division between 1992 and 1998 by the expedient of using the return on assets of the Dayton division as a basis for a calculation of lost profits partakes of the same speculative nature that infected many of plaintiff's earlier damage claims. *See Fifth Third VIII*, 402 F.3d at 1236 (affirming court's ruling that "[p]laintiff's cover damages claim, like lost profits claims, is highly speculative"). The court finds that the claim for lost operating profits from 1992 to 1998 has not been established with reasonable certainty as a matter of fact and law because of the lack of identified investment opportunities. The court's agreement or disagreement with individual adjustments to the lost operating profits part of the model-specifically, questions regarding interest costs-are offered only for the sake of completeness.

Using the $400 million in assets, Dr. Brumbaugh restores the operating profits lost by Citizens due to its sale of the Cincin-

nati division in the years 1992 to 1998. These represent the additional earnings that would have accrued to Citizens had the Cincinnati division not been sold. To determine these earnings, Dr. Brumbaugh takes the $400 million in assets that the Cincinnati division would have had available to it and then determines the profit that would have been made on these assets, reduced by the higher costs associated with the Cincinnati division.

Dr. Brumbaugh multiplies the restored assets by Citizens' actual return on assets, adjusted for the higher cost of funds in the Cincinnati division. This number is referred to as the return on average assets. This return is less for the Cincinnati division because Cincinnati had higher costs. These higher costs are represented in "basis points," and Dr. Brumbaugh uses a 72-basis point (0.72%) differential to show the Cincinnati division's higher interest costs and direct overhead.[20] Dr. Brumbaugh then applies this adjusted rate of return to the assets of the Cincinnati division over the period from 1992 to 1998. The ultimate sum in lost profits is $10.552 million.

Defendant attempts to show the lack of support for Dr. Brumbaugh's use of the average return on assets of the Dayton division as a basis for the average return on assets of the Cincinnati division. Prof. Saunders testified that, because Citizens was in Dayton, Ohio, and the Cincinnati branch obviously in Cincinnati, "[t]here's absolutely no reason why the mix of assets and earnings on assets would be the same . . . ." Tr. at 4959. Defendant also argues that Dr. Brumbaugh's 72-basis point differential is too low, resulting in an overstatement of the Cincinnati division's average return on its assets. For this defendant relies on the Kaplan Smith report, which posits that "[i]ndirect overhead expenses are also likely to be higher given the greater distance of these branches from the main office." Kaplan Smith Report, PX 694, at 7. Mr. Whalen speculated that some of these costs would be associated with the driving distance between Cincinnati and Dayton, which he estimated to be a three-hour drive. Tr. at 4144.

---

**20.** One basis point is the equivalent of one one-hundredth of one percent.

Plaintiff rejoins that Prof. Saunders makes use of the underlying data from the Kaplan Smith Report that Dr. Brumbaugh uses to calculate his 72–basis point differential. *See* Why Did Citizens Sell Its Cincinnati Branches? Profitability Concerns, DX 4217 (citing the Kaplan Smith Report, PX 694, at 7). On a more practical note, the distance between Cincinnati and Dayton is 48.75 miles, which equates roughly to a 51–minute drive. Mapquest, Driving Directions from Dayton, OH to Cincinnati, OH, PX 2021. Dr. Brumbaugh testified that with a drive that short, the costs would be *de minimis* and that, as a former bank manager himself, he could identify no other costs related to branch distance from the main office. Tr. at 5456–58.

The court finds that the 72–basis point number would be reasonable and that costs associated with a branch office less than fifty miles away likely would be *de minimis*. The court accepts the testimony of Dr. Brumbaugh on this point. If the court agreed with Dr. Brumbaugh's method of marking down the Dayton division's return on assets in order to find the operating profits of the Cincinnati division, then a reduction of 72–basis points would be a reasonable deduction. However, as noted above and explicated in the legal discussion below, the court does not agree with this methodology.

### 3) *Sale of assets*

Citizens was sold to Fifth Third in 1998. If the Cincinnati division still had been a part of Citizens at that time, it would have been sold to Fifth Third. Dr. Brumbaugh calculates that the proceeds from such a sale in 1998 would have been $11.128 million greater than the proceeds of the sale to Banc One in 1991. He attributes this difference principally to the improvement of economic conditions for thrifts between 1992 and 1998. Dr. Brumbaugh's calculation reflects the deposit premium that Fifth Third would have received from Citizens. Dr. Brumbaugh selects a deposit premium of 7% by averaging the deposit premiums for branch sales in 1998, which came to 8.7%, then chooses a number somewhat below it in order to be conservative. He then multiplies the 7% premium by the $400 million in assets; from the resulting number, he subtracts the proceeds of the previous sale.

Defendant contests the 7% deposit premium. Prof. Saunders deems Dr. Brumbaugh's analysis to be flawed because the analysis included data from non-Ohio thrift sales, as well as data from the sale of bank branches instead of thrift branches. Tr. at 4960–62. Prof. Saunders would use a 6% premium, because that is the only datum point included in Dr. Brumbaugh's sample that is both a sale of thrift branches and in Ohio. In the alternative, Prof. Saunders averages the six data points that involved the sale of thrift branches and calculates a 4.73% premium. Tr. at 4965–66.

Plaintiff fires back that the evidence shows such premiums are too low. First, when Citizens actually sold the Cincinnati division to Banc One in June 1991, it received a 4.85% deposit premium. In 1991 the average deposit premium in the United States was 2.67% and 2.15% in Ohio, which signifies that Citizens received approximately twice the average deposit premium. In 1998 the national deposit premium average was 8.7%. Dr. Brumbaugh did not double that number, but selected something below it. In any event, Prof. Saunders's 4.73% premium is less than the 4.85% premium that Citizens actually received for the sale of its branches, which, because the economy was doing better, not worse, makes little sense.

Dr. Brumbaugh also points out that Prof. Saunders is using an unweighted average to derive his 4.73% figure. Of the six transactions in Prof. Saunders's exhibit, some are the sales of large branch systems, while others are the sales of small branch systems. *See* Brumbaugh's Lost Profits Claim Is Flawed and Unreliable: Brumbaugh's Six Transactions Where the Branches Sold Are Thrifts, DX 4232. These transactions differ in the size by up to $1.0 billion. Thus, Dr. Brumbaugh suggests taking a weighted average of the deposit premiums instead of a straight average, on the theory that larger branch sales command larger deposit premiums. The weighted average deposit premium comes out to 7.1%. Tr. at 5468.

The dearth of data regarding the deposits of thrift branches in Ohio troubles the court.

The court accepts Dr. Saunders's testimony that plaintiff could have advanced a better way to calculate it. However, using a single datum point for comparison purposes is, if anything, worse. The court adopts the method of using the six data points for thrift branch conversions, while crediting Dr. Brumbaugh's method in taking a weighted average, rather than a straight average, of the thrift sales. As this weighted average is 7.1%, and plaintiff asks for a 7% premium, the court finds the 7% premium reasonable. The court notes that this premium also presents a specific investment opportunity for Citizens, i.e., its sale to Fifth Third in 1998. This feature distinguishes the claim as more specific than the claim for lost operating profits between 1992 and 1998.

### 4) *Other asserted problems with the Cincinnati damages model*

Defendant attacked other aspects of the model. Prof. Saunders testified that when the sale of the Cincinnati deposits was reversed, the model failed to deduct interest-rate "swaps" from the 1992 to 1998 lost profits period or the post-March 1998 lost profits period.[21] This deduction amounts to $4.98 million. Dr. Brumbaugh concedes that the swaps should have been deducted, and plaintiff in its post-trial brief has deducted them from its damage claims. Pl.'s Br. filed Mar. 1, 2006, at 32. This reduces plaintiff's damages claim for the sale of the Cincinnati division from $24.028 million to $19.048 million.

Dr. Brumbaugh also restores $15,000.00 per day in the period between March 15, 1991 and June 14, 1991, for a total of $1.365 million, due to the carrying costs of cash. In opposition Prof. Saunders testified that the mortgage-backed securities that Citizens sold to finance the deposit transfer should have been sold only 30 days prior to closing, rather than 91 days early, as actually occurred. This allegedly would have caused no problems, testified Prof. Saunders, because mortgage-backed securities "are very liquid securities." Tr. at 4976. Citizens' carrying costs

of cash accordingly would have been reduced by $915,000.00.

Mr. Vichich explained in detail during the first trial session in 2003 that the OTS had indicated to Citizens that it would expedite the approval of the Cincinnati sale. Tr. at 1652. The court finds that Mr. Vichich reasonably relied on this advice in the circumstances. The OTS indicated that it would waive the 30–day waiting period, which would have enabled the Cincinnati deal to have closed by March 31, 1991. Ultimately, this did not come to pass, but Mr. Vichich acted prudently to be prepared for it. In addition, the price of these mortgage-backed securities was trending downward at the time, and Mr. Vichich wanted to sell them to lock in the relatively higher price, a move that Dr. Brumbaugh concurred was "prudent." Tr. at 5482. Finally, had Mr. Vichich sold the securities any later, the resulting $4 million loss would have appeared on Citizens' balance sheet a quarter beyond, thereby jeopardizing the three quarters of profit required to convert from a mutual to a stock corporation. It was Dr. Brumbaugh's opinion that it is "conceivable that if Mr. Vichich followed the strategies suggested by Prof. Saunders, the institution would have failed, because it wouldn't have been able to convert and the institution would have been closed." Tr. at 5482–83.

The court was impressed with the testimony of Dr. Brumbaugh and agrees that Mr. Vichich's decision to sell the mortgage-backed securities in March of 1991 was reasonable. Mr. Vichich testified that the OTS had indicated the process would be expedited. Facing the possible failure of Citizens if the conversion went awry, Mr. Vichich had a strong incentive to be cautious. Plaintiff is therefore entitled to the carrying costs of cash.

Prof. Saunders also claims that when Dr. Brumbaugh reversed the Cincinnati sale, he should have deducted the interest cost on the $4.83 million net gain that Citizens actually received in the sale; this amounts to a deduction of $1.634 million. Tr. at 4971–73; *see*

---

**21.** The definition of a "swap" in this context is a contract in which two parties agree to exchange periodic interest payments, especially when one

payment is at a fixed rate and the other varies according to the performance of a reference rate.

*also* Lost Profits Based on Additional Interest Cost, DX 4235. Conceptually stated in the obverse, Citizens made a $4.83 million "profit" on the actual sale, and it would lose the interest on that profit if the sale were reversed. This amount would be subtracted from the 1992 to 1998 lost operating profits claim for the Cincinnati division damages.

Dr. Brumbaugh disagrees, believing that the proposed $1.634 million deduction represents unallowable prejudgment interest in favor of the Government. Tr. at 5477–78. Plaintiff also believes that Prof. Saunders would deduct too much because the costs of the loan should only extend as long as Citizens would have had to borrow. The hypothetical conversion of Citizens in August 1993 would have enabled repayment of the $4.83 million loan. Then, based upon Prof. Saunders's own calculations—with these changed dates—the cost of interest would be only $536,000.00.

The court agrees with Prof. Saunders that the cost of interest should be deducted from the Cincinnati division's 1992 to 1998 lost profits claim and also agrees with plaintiff that it should only be deducted until the conversion, when the loan would have been repaid. Were the court to award plaintiff lost profits for the Cincinnati division from 1992 to 1998, the court would reduce this profit by $536,000.00, unless this reduction were deemed mitigation as a matter of law. However, because the court finds the lost operating profits claim too speculative as a matter of fact and law, this deduction is inapplicable and moot.

Next, Mr. Vichich testified that, to fund the sale of the Cincinnati division, Citizens borrowed $80 million from the FHLB. Tr. at 1490–92. Defendant contends that plaintiff's damages should be reduced in some way to account for the costs of the loan. Prof. Saunders accomplishes this by reducing the inputs to Dr. Brumbaugh's model by $80 million. Although plaintiff disputes that this adjustment should be made at all, plaintiff argues that it would take the form of an offset to damages, much like the interest costs above, rather than reduce the inputs to the Brumbaugh model. In addition, Dr. Brumbaugh testified that, as of the date of the actual

mutual-to-stock conversion in January 1992, Citizens would no longer have need for these borrowings to offset the effects of the sale of the Cincinnati division. Tr. at 5453–54. Therefore, the costs of the loan would have accrued June 1991 and January 1992. During those two years, the profitability of the Cincinnati division would have been reduced. The amount of the appropriate deduction can be calculated based upon the facts developed in the record. Mr. Kirby noted that the FHLB borrowings were 70 basis points less than Citizens' deposit costs. DX 1134 at 2303. Multiplying 0.7% by the $80 million yields the annual interest cost, which then must be adjusted to reflect its applicability for a period of seven months. This results in an offset of $327,000.00.

While the court agrees with Prof. Saunders that some account should be taken of the costs of interest, this should be handled as an offset to damages—specifically the lost profits of the Cincinnati division between 1992 and 1998—rather than a change to Dr. Brumbaugh's inputs. The court also agrees with plaintiff that it should be applicable only as long as the loan was used to offset the Cincinnati division's sale. Therefore, if the court were to award plaintiff lost operating profits for the Cincinnati division between 1992 and 1998, the Cincinnati division damages claim would be reduced by $327,000.00, unless this reduction were deemed mitigation as a matter of law. However, because the court finds the lost operating profits claim too speculative as a matter of fact and law, this deduction is inapplicable and moot.

Mr. Whalen testified that Dr. Brumbaugh should have deducted an additional $16.134 million in goodwill amortization. Tr. at 4380; Citizens Federal Calculation of Cincinnati's Operating Income (Loss) (1992—1998), DX 4007. Plaintiff responds that Mr. Whalen was mistaken because Citizens already had written off the goodwill, a fact which Mr. Whalen did not appear to realize. *See* Tr. at 4380, 4455. Dr. Brumbaugh testified: "[W]e know that the actual bank wrote off the goodwill in March 1991. If one were to calculate lost profits by reinserting the amortization of the goodwill, it would be imposing the cost of the amortization on the bank

twice . . . ." Tr. at 5565–96. Dr. Brumbaugh is correct.

### 3. *Damages associated with the premature conversion*

Plaintiff argues that it was damaged by being forced to convert "at an economically inopportune moment, when the effects of FIRREA and the ongoing [savings and loan] crisis, compounded by the weakening economy, had rendered thrifts far less attractive investments . . . ." Pl.'s Br. filed Feb. 24, 2003, at 26. Testimony in support of this theory was Mr. Riggins, plaintiff's expert in valuation appraisals and mutual-to-stock conversions. Defendant, in addition to its argument that conversion proceeds cannot be damages, contends that Mr. Riggins's appraisal is unreliable.

#### 1) *Plaintiff's damages theory*

Mr. Riggins calculates lost conversion proceeds by first determining when Citizens would have converted absent the breach. Second, he calculates the proceeds that would have resulted from this hypothetical later conversion. Finally, from these hypothetical conversion proceeds, he subtracts the proceeds of the actual conversion to determine the difference. This difference represents the damages that plaintiff incurred from reduced conversion proceeds.

Mr. Riggins uses August 1993 as the date of the hypothetical conversion. He selected this date because it was the first one that met the three conditions set by Citizens management in 1996 before Citizens would enter into a conversion: two to three years of turning an operating profit, a strong conversion market, and the desire for extra capital. Mr. Kirby testified that the bank would not have converted from a mutual to a stock corporation without three consecutive years of positive earnings. Tr. at 463, 542. Mr. Vichich testified that the thrift wished to wait to convert until it had "establish[ed] core earnings, having core earnings grow for a two-to-three year period." Tr. at 1431. The thrift also "want[ed] a strong market to be selling into." Tr. 1432. He testified that the thrifts conditions for conversion "would have been satisfied in 1993." Tr. at 1433. Also, on August 19, 1993, Citizens issued $40.25 million in subordinated notes in order to raise capital. This demonstrates, it is alleged, that Citizens desired to raise capital on that date. Thus, as Mr. Riggins testified, he selected the first date that met those conditions and did not seek a date that merely would maximize conversion proceeds. Tr. at 5295–96.

Using August 20, 1993 as the date of the conversion, Mr. Riggins then calculated how much Citizens would have gained in conversion proceeds at that time. Mr. Riggins appraised Citizens' value as of that date using regulatory valuation guidelines promulgated by the OTS—the same regulations that also governed the actual January 1992 conversion. These guidelines require a *pro forma* calculation of the market value of the bank, which Mr. Riggins based, where possible, upon the Kaplan Report's appraisal of Citizens. The guidelines also require that the appraisal take into account the prices of publicly traded thrift stock of similar thrifts, which Mr. Riggins calls the "Peer Group." These valuations are then altered based upon differences between the converting thrift and the Peer Group.

Mr. Riggins developed three separate valuations based upon three different possibilities regarding the Cincinnati division. In plaintiff's preferred calculation, the Cincinnati division is restored to the hypothetical Citizens, along with the operating profits that it would have created, resulting in a larger bank with more assets, which nets a greater amount of conversion proceeds. Mr. Riggins values this scenario at $87 million, with net conversion proceeds of $83.520 million after removing miscellaneous costs. Because Citizens raised $31.86 million in its actual January 1992 conversion, Mr. Riggins subtracts that amount, as well. He then subtracts an additional $3.665 million for costs related to the delayed conversion. This results in total damages for this scenario of $47.085 million. In a second scenario, Mr. Riggins assumes that the Cincinnati division was restored, but without its resulting operating profits. Mr. Riggins values this scenario at $84 million, or $79.8 million after costs are subtracted, and $44.235 million after downward adjustments for proceeds gained in the actual conversion

and other adjustments. In a third scenario, Mr. Riggins assumes that Cincinnati is not restored at all. In this scenario he values Citizens at $65 million, or $62.5 million once conversion costs are subtracted. After subtracting the previous conversion proceeds and making miscellaneous adjustments, this amount of damages is $30.5 million.

Thus, Mr. Riggins offers three possible damage scenarios due to lost conversion proceeds from the premature conversion: $47.085 million if Cincinnati is restored with operating profits; $44.235 million if Cincinnati is restored without operating profits; and $30.5 million if Cincinnati is not restored at all. These damage figures do not include the gross-up for taxes, nor the separate damages for the loss of the Cincinnati division.

### 2) *Defendant's objections*

In addition to advocating that a reduction in proceeds from a stock conversion cannot be considered damages at all, defendant finds Mr. Riggins's appraisals of the stock value to be "implausible." Def.'s Br. filed Dec. 16, 2005, at 22. Conversion proceeds after the January 1992 conversion were $31.9 million. Mr. Riggins calculated that in August 1993, when Citizens claims that it would have converted absent the breach, conversion proceeds would have been $62.4 million. This is an increase of 96%. Prof. Saunders deemed this increase to be unrealistic. He based this opinion, in part, upon a comparison of Citizens with its Peer Group. The thrift stock price index went up by only 57%, and Citizens' peer group had median increases in their price-to-assets ratio of only 64%, increases in their price-to-book equity ratio of 86%, and increases in their price-to-earnings ratio of 25%. Plaintiff counters that this is comparing apples and oranges, stating that "there is no mathematical correlation between conversion proceeds and pricing ratios that would produce comparable increases." Pl.'s Br. filed Mar. 1, 2006, at 15. Mr. Riggins testified in support of plaintiff's position that when the appraised value of a conver-

sion doubles, the pro-forma price-to-book ratio increases by only 35%. Tr. at 5306.

Defendant also considers the appraisals to be untrustworthy because they are based solely on the judgment of Mr. Riggins. Mr. Riggins followed the process for thrift appraisals that the OTS prescribes. Nonetheless, Prof. Unal's opinion is that conversion appraisals outside of a courtroom are not accomplished in a vacuum, but reflect the feedback of investment bankers and appraisers and have the stamp of approval of the OTS. See Tr. at 4630–36. According to Prof. Unal, when a bank is planning a conversion, it relies primarily upon investment bankers to assess the market. Tr. at 4632–33. Appraisers, such as Mr. Riggins, work in conjunction with investment bankers. Tr. at 4646–47. Mr. Riggins's attempt to calculate the value of the conversion proceeds without consulting an investment banker, in the view of both defendant's expert economists, represents a flawed methodology and is inconsistent with the FHLBB Guidelines for the Valuation of S & LS Converting from Mutual to Stock Form of Organization (the "FHLBB Conversion Guidelines").[22]

Also, Prof. Unal lamented that, in a courtroom setting, Mr. Riggins is free from the checks and balances of the real world. In the real world, the OTS can check the price, and management can signal the price's validity by purchasing or declining to purchase shares. Neither is true in court, leaving Mr. Riggins with incentives to misjudge.

Prof. Unal also evaluated Mr. Riggins's previous, real world appraisals as unreliable, because they resulted in excessive run-up in the price of the stock after the initial sale. This run up is an indication that it was underpriced in the initial public offering. Tr. at 4639–41. Prof. Unal opined that, if Mr. Riggins had made such errors in his real world appraisals, "what evidence would we have here that he would not make the same error on the management side in this [Butfor] world?" Tr. at 4641.

22. The guidelines state that "[i]t is inappropriate and incorrect to rotely apply a formula to derive an estimated value of an equity security such as an [Savings and Loan ('S & L')] stock." Expert Report of Prof. Haluk Unal, Ex.: FHLBB Conversion Guidelines, DX 939, Ex. 2 at 14. Prof. Unal contends that is exactly what Mr. Riggins did: "[H]e has to know ... the conversion proceeds ... before he gets [the] conversion proceeds out of the equations ...." Tr. at 4657.

Defendant takes issue with, and provided expert testimony regarding, the discount rate used by Mr. Riggins, which was 7.46 %, much lower than an earlier appraisal in the Kaplan Report of 18.5 %. Defendant moreover faults Mr. Riggins's price-to-earnings ratios as suspect and contends that the peer group for the "But-for Bank" should have changed when its earnings base changed.

Defendant also objects to Mr. Riggins's conversion costs, which assumed a cheaper "best efforts" underwriting for the conversion. Mr. Riggins explained that "[a] best efforts offering is an offering whereby the investment banker does not commit to or guarantee the completion of the offering. The investment banker will use its best efforts to complete the [conversion offering], but there is no guarantee." Tr. at 5309. He used a best efforts conversion in his calculations because the thrift conversions in his 1993 Peer Group "were all best efforts." *Id.* He believes that Citizens would have done the same. The court agrees.

As defendant contends, the appraisals of Mr. Riggins are tied closely to his trustworthiness and judgment. However, the court does not have the luxury of seeing how the OTS or the market would react to Mr. Riggins's appraisal. The courtroom process for determining damages necessarily lacks "real world" checks on the appraisal value. On the other hand, Mr. Riggins's appraisal was not conducted in a vacuum, but under the close scrutiny of defendant's experts and the able cross-examination of its counsel. Mr. Riggins weathered the questioning, impressing the court with his sound judgment. Mr. Riggins has worked for both the Government and other private parties on various appraisals. He has performed over 200 appraisals which have been approved by government regulators, including the largest thrift conversion of all time. The OTS has solicited him to perform appraisals in arbitration, and he was invited by the OTS to give a presentation on mutual-to-stock conversions. His credentials do not exhibit a bias, and he would have much to lose by testifying dishonestly for the sake of plaintiff. Judging his language, the content of his testimony, and his demeanor, the court does not consider that Mr. Riggins was being dishonest about the appraisal of Citizens; in fact, he offered a valid opinion of Citizens' value in a 1993 conversion. To the extent that the appraisal of the "But-for" Citizens is based upon the judgment of Mr. Riggins, the court credits that judgment.

The criticisms of Mr. Riggins's report are almost exclusively of its inputs and outputs. Neither Profs. Unal nor Saunders has ever performed an appraisal. Prof. Unal could point to no faults in Mr. Riggins's mathematics. Tr. at 4741–42. The court finds the inputs and outputs of Mr. Riggins's report to be reasonable, based upon the reasons given in his report and his testimony in the first and second trial sessions. This includes the August 1993 conversion date, as the court believes Mr. Riggins's assertion that he chose the first date that met Citizens' management's conditions, rather than one that maximized profits. On this point the court also relies on the testimony of Messrs. Kirby and Vichich.

### 4. *Alleged double-counting*

Defendant charges that plaintiff counts twice certain aspects of its damages relating to lost profits. Mr. Riggins includes in his model a larger sale value of Citizens because of the restoration of the Cincinnati deposits. The theory is that Fifth Third would have paid more for a larger bank; therefore, the loss of the Cincinnati deposits reduced conversion proceeds. Dr. Brumbaugh, in his model, restores these Cincinnati deposits to Citizens and counts the profits the deposits would have produced for Citizens until its sale as part of the Cincinnati division damages calculation. Defendant deems this double-counting: once as reduced conversion proceeds and a second time as the value that these deposits would have had in 1998.

Plaintiff contends that "the facts of this case demonstrate that Fifth Third's claim for reduced conversion proceeds does not in anyway overlap the Cincinnati damages claim." Pl.'s Br. filed Mar. 1, 2006, at 36. Absent the breach, Citizens would not have sold Cincinnati and would have converted in August 1993. This would have restored to Citizens the $400 million in assets and their resulting

profits; in addition, the bank would have obtained larger conversion proceeds, in part, because it was a larger bank with more assets. This would have included assets obtained from lost profits. At the time of the merger with Fifth Third, Citizens would still have had these assets on its books, while, in the actual sale, they were absent.

The facts demonstrate that there was no double-counting of assets. The court also notes that, to the extent defendant's argument relates to double-counting of lost operating profits from the Cincinnati division, it is moot, because the court declines to award lost operating profits.

## VII. *Testimony regarding taxation of damage awards*

Prior to trial the court ruled that an award of reduced conversion proceeds was taxable as a matter of law, which is discussed separately below. *See* Order entered Jan. 4, 2006, ¶ 10. Plaintiff proceeded to present evidence of what Fifth Third's income tax rate would be on a damage award for conversion proceeds. James B. Haas, Fifth Third's Director of Corporate Tax, testified that Fifth Third has paid a 35% federal marginal tax rate from 2001 to 2004. Fifth Third expects to pay the same 35% marginal tax rate in 2005. This marginal rate is the rate associated with the highest tax bracket. Mr. Haas testified that this bracket starts at income levels of $18.3 million. Fifth Third's 2005 income, based on current estimates, will be in excess of $1.9 billion. Defendant does not dispute these figures. Mr. Haas is not aware of anything that would cause Fifth Third's income in the next several years to drop so precipitously that it would dip from $1.9 billion in income to less than $18.3 million. However, if such a catastrophe did befall Fifth Third, the tax bracket below the $18.3 million mark actually has a higher rate of marginal taxation, signifying that Fifth Third would pay even more than the 35% tax rate on which it basis its gross-up claim.

In addition, plaintiff's counsel has stipulated that any grossed-up conversion proceeds award that Fifth Third receives will be reported to the Internal Revenue Service (the "IRS") as taxable income. Pl.'s Br. filed

Nov. 22, 2005, at 6. If plaintiff is not taxed, plaintiff's counsel stipulates to an order that the amount be refunded.

Therefore, according to Mr. Haas, 35% is the appropriate marginal tax rate to use in a gross-up calculation. In order to gross up the damage awards, the court should divide the conversion proceeds damage award by 0.65.

Defendant opposes gross-up as a matter of law. It also points out that Fifth Third paid the alternative minimum tax in tax year 2000, which was 20% instead of 35%. Mr. Haas, however, testified that 2000 was an exceptional circumstance which is not anticipated to occur again in the near future. Tr. at 3637–39.

The court finds that the appropriate tax rate is 35%. Any award of conversion proceeds will be grossed-up to account for these taxes by dividing the award by 0.65.

## DISCUSSION

### I. *Standards for awarding damages in Winstar cases*

The Federal Circuit determined that a contract existed between Citizens and the Government and the contract was breached. *Fifth Third VIII*, 402 F.3d at 1235. All that remains to be decided is whether the breach caused damages to Citizens and, if so, in what amount.

Plaintiff's outstanding damages claims are for breach damages caused by the premature conversion and the sale of the Cincinnati division, *Fifth Third IV*, 55 Fed. Cl. at 246, which the parties agree are a form of expectancy damages. See Pl.'s Br. filed Mar. 1, 2006, at 8; Def.'s Br. filed Dec. 16, 2005 at 25. Expectancy damages are intended to return "[t]he benefits that were expected from the contract" in the absence of a breach to the non-breaching party. *Glendale Fed. Bank, FSB v. United States*, 239 F.3d 1374, 1380 (Fed.Cir.2001) ("*Glendale I*"). Expectancy damages include lost profits, but are not limited to them. *Id.*

A party is entitled to expectancy damages if it succeeds in making three show-

ings: First, the damages must have been reasonably foreseeable at the time the parties created the contract. *Cal. Fed. Bank v. United States,* 395 F.3d 1263, 1267 (Fed.Cir. 2005). Second, the damages would not have occurred "but for" the breach. *Id.* Third, "the measure of damages must be reasonably certain, although if 'a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery.'" *Id.* at 1267 (quoting *Glendale Fed. Bank v. United States,* 378 F.3d 1308, 1313 (Fed.Cir.2004) ("*Glendale II*")). These standards are detailed below.

Foreseeability, but-for causation, and proof of damages to a reasonable certainty are all issues of fact to be determined by the trial court. *Bluebonnet Sav. Bank, F.S.B. v. United States,* 266 F.3d 1348, 1355–57 (Fed. Cir.2001) (holding that "[f]oreseeability is a question of fact reviewed for clear error," "[c]ausation is also a question of fact reviewed under the clear error standard," and reviewing a finding of reasonable certainty under the clear error standard). The burdens of proving causation, foreseeability, and damages lie with the claimant. *See, e.g., Willems Indus., Inc. v. United States,* 155 Ct.Cl. 360, 295 F.2d 822, 831 (1961).

### 1. *Foreseeability*

As the Federal Circuit has held, "[e]xpectation damages are recoverable provided they are actually or reasonably foreseeable ...." *Bluebonnet Sav. Bank,* 266 F.3d at 1355; *see also Cal. Fed. Bank,* 395 F.3d at 1267. " '[In order to have been foreseeable] the injury that occurs must be one of such a kind and amount as a prudent man would have realized to be a probable result of his breach.'" *Landmark Land Co. v. FDIC,* 256 F.3d 1365, 1378 (Fed.Cir.2001) (alteration in original) (quoting 5 Arthur Corbin, Corbin on Contracts, § 1012 (1964)). Corbin on Contracts precisely explicates the rule:

The existing rule requires only reason to foresee, not actual foresight. It does not require that the defendant should have had the resulting injury actually in contemplation or should have promised either impliedly or expressly to pay therefore in case of breach. It is erroneous, therefore, to

refuse damages for an injury merely because its possibility was not in fact in the contemplation of the parties at the time they made the contract.

11 Corbin on Contracts, § 1009; *see also Anchor Savings Bank, FSB v. United States,* 59 Fed.Cl. 126, 143–44 (2003).

### 2. *But-for cause*

The breach must be the but-for cause of the damages. *See Cal. Fed. Bank,* 395 F.3d at 1267. The non-breaching party must, by a preponderance of the evidence, definitely establish "the causal connection between the breach and the loss of profits." *Id.* at 1267–68.

The breach may not constitute simply a "substantial factor" in causing the damages. *Id.* at 1268. However, "[t]hat is not to say that the breach must be the sole factor or sole cause in the loss .... The existence of other factors operating in confluence with the breach will not necessarily preclude recovery based on the breach." *Id.* (citing E. Allan Farnsworth, Contracts § 12.1, at 150–51 (3d ed.2004)).

### 3. *Proof of damages to a reasonable certainty*

Finally, the non-breaching party must prove its damages to a reasonable certainty. *See Cal. Fed. Bank,* 395 F.3d at 1267. However, " 'where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision ....' " *San Carlos Irrigation & Drainage Dist. v. United States,* 111 F.3d 1557, 1563 (Fed.Cir.1997) (quoting *Elec. & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 416 F.2d 1345, 1358 (1969)). When damages are not proved with mathematical precision, "the court's duty is to 'make a fair and reasonable approximation of the damages.'" *Bluebonnet Sav. Bank,* 266 F.3d at 1356–57 (quoting *Locke v. United States,* 151 Ct.Cl. 262, 283 F.2d 521, 524 (1960)).

One particular type of expectancy damages is lost profits. Lost profits are available when the loss of profit "is the proximate result of the breach and the fact that there would have been a profit is definitely estab-

lished, and there is some basis on which a reasonable estimate of the amount of the profit can be made." *Neely v. United States*, 152 Ct.Cl. 137, 285 F.2d 438, 443 (1961); *see also LaVan v. United States*, 382 F.3d 1340, 1349 (Fed.Cir.2004). The parties debate whether lost profit damages command a higher standard. Defendant argues that "[i]n this circuit, the fact of lost profits must be 'definitely established.'" Def.'s Br. filed Dec. 16, 2006, at 34 (quoting *Neely*, 285 F.2d at 443).

Plaintiff, for its part, cites the *Glendale* line of cases. In *Glendale I* the Federal Circuit commented that lost profit cases applied a "generous standard of proof." *Glendale I*, 239 F.3d at 1380. However, despite this generous standard of proof, "[t]he problems of proof attendant on the burden placed on the non-breaching party of establishing lost profits-on establishing what might have been-are well recognized." *Id.* The court also stated that, in some lost profit cases, "the proof problems can … prove to be insurmountable." *Id.* In *Glendale II* the Federal Circuit stated that in *Winstar* cases "lost profits … [are] generally not susceptible to *reasonable proof.*" *Glendale II*, 378 F.3d at 1313 (emphasis added).

A synthesis of the law does not reveal any recognition of the higher standard for proving lost profits that defendant suggests. To the contrary, as with all expectancy damage claims, plaintiff must prove to a reasonable certainty that such damages would have occurred. *See Glendale II*, 378 F.3d at 1313; *Glendale I*, 239 F.3d at 1380. The difficulty with proving lost profits lies not with a higher standard of proof, but with the intractable

problem of "establishing what might have been," *Glendale I*, 239 F.3d at 1380, in the speculative arena of lost profits. This interpretation is consistent with the Federal Circuit's statement on remand that "[t]he lost profits theory, though not absolutely barred in *Winstar*-related cases as a matter of law, has not been susceptible of proof due to its speculative nature." *Fifth Third VIII*, 402 F.3d at 1237 (citing, *inter alia*, *Glendale II*, 378 F.3d at 1313). It is the nature of the damages themselves that cause the difficulty in proof, not vice versa.

The court therefore requires plaintiff to prove its lost profit damages by the same reasonable certainty standard that the Court of Federal Claims applies to all claims for expectancy damages. However, as explicated below, the court finds as a matter of fact that plaintiff has not proved its lost operating profits claim sufficiently to meet even a reasonable certainty standard, while plaintiff definitely has established its claim for lost profits as measured by the deposit premium in its sale to Fifth Third. Thus, the choice in damages standard is largely academic.

## II. *But-for cause and foreseeability*

Defendant's arguments on causation echo the Government's arguments in *Hansen Bancorp, Inc. v. United States*, 67 Fed.Cl. 411 (2005), *appeal dismissed, Hansen Bancorp, Inc. v. United States*, No. 05–5011, 2006 WL 1308633 (Fed.Cir. Apr. 18, 2006), but as the court advised defendant at trial, this case is not *Hansen*.[23]

The court finds that the breach was the but-for cause of both the sale of the Cincin-

---

**23.** While the arguments in *Hansen* fell *per force* under the heading of "material breach," they are analogous in most respects to the causation arguments made by defendant in the instant case. In both cases defendant argued that, with or without FIRREA, the same ultimate outcome would have occurred. *See Hansen*, 67 Fed.Cl. at 416.

A key difference exists between *Hansen* and the case at bar. In *Hansen* the bank would have had, by a significant margin, insufficient capital to meet the standards of FIRREA, even if the bank could have counted supervisory goodwill towards those requirements. *See id.* at 416, 434 (noting that "if [the bank] was entitled to the lesser amount of goodwill … plaintiffs cannot complain that [the bank]'s operations would not

have been subjected to these [regulatory] requirements," then finding that the bank was indeed entitled only to the lesser amount of goodwill).

By contrast, in the instant case, if Citizens had been allowed to count goodwill, it would have been in compliance with two of the three FIRREA capital requirements and could have come into compliance with the third capital requirement by the available expedient of purchasing recourse insurance a few months earlier than it otherwise did. *See* Expert Report of R. Dan Brumbaugh, PX 1486, at 26; Tr. at 2463. Therefore, by the time FIRREA took effect in December 1989, Citizens easily would have been in compliance with all three of FIRREA's capital requirements.

nati division and the premature conversion. Defendant's causation arguments are altogether unpersuasive. Sr. Judge Smith, faced with similar arguments from the Government, put it succinctly: "The Court finds that the Government's assertion that [the bank]'s loss of equity ... was not caused by the breaches but by poor quality assets, poor liquidity and operating problems, unpersuasive. This is like saying that a victim of a gunshot dies from loss of blood not the gunshot." *Slattery v. United States*, 69 Fed.Cl. 573, 583 (2006). In addition, the damages that resulted from these events were eminently foreseeable.

While it is certainly possible to have *Winstar* cases in which resulting damages were not caused by the breach, it is a rare case, and the record after remand shows that this decidedly is not one of them. Defendant's insistence that zero is the appropriate amount of damages brings to mind the guidance of the Federal Circuit regarding *Winstar* litigation: "It would benefit the thrifts and the Government, since it is not in the interest of either to have endless litigation, for both to stop arguing extreme positions and promptly resolve these cases in a fair and even-handed manner." *Glendale Fed. Bank*, 378 F.3d at 1313–14.

### 1. *The sale of the Cincinnati division*
#### 1) *FIRREA was the but-for cause of the Cincinnati sale*

█ Defendant argues that "it was not the breach that caused Citizens to sell Cincinnati but an independent business decision that the division needed to be sold to regain profitability." Def.'s Br. filed Dec. 16, 2005, at 28. Plaintiff presented evidence to the contrary.

For the reasons detailed in the factual discussion above, the court finds that the Cincinnati division would not have been sold if the breach had not occurred. Plaintiff has definitely established this causal connection. The court has no doubt that, had FIRREA not breached Citizens' contract with the Government for special goodwill accounting, Citizens would not have been forced to file a capital plan and thus would not have been pushed by the regulators into selling the Cincinnati division to raise tangible capital.

Defendant also argues that the breach did not cause the sale of the Cincinnati division because "the same [regulatory] pressure would have existed in the absence of the breach." Def.'s Br. filed Mar. 1, 2006, at 8. Plaintiff has proved, and the court has found as a matter of fact, that absent the breaching provisions of FIRREA, Citizens would not have been forced to submit a capital plan to the regulators. The court also does not see a basis in the record for a finding that, absent the breach, the regulators would have regulated Citizens as stringently as they did.

The other factors presented by defendant, such as allegedly poor management or low profitability were at most "other factors operating in confluence with the breach" that " will not necessarily preclude recovery based on the breach." *Cal. Fed. Bank*, 395 F.3d at 1268. The sale of the Cincinnati division would not have occurred absent the breach, poor profits or no; and the management was not poor. FIRREA and the resultant capital plan that Citizens was required to file caused Citizens' sale of the Cincinnati division.

#### 2) *The damages caused by the Cincinnati division sale were foreseeable*

Defendant argues that the Government could not have foreseen, at the time of the contract, that the "Cincinnati deposits could be leveraged into profits" or that "the value of the residual deposits would be greater than 1998 than 1991." Def.'s Br. filed Mar. 1, 2006, at 16. Plaintiff responds that

[t]he [G]overnment could reasonably have foreseen, at the time Citizens' supervisory acquisitions were made and the goodwill contracts entered, that if Citizens ever lost the ability to count the supervisory goodwill towards its regulatory capital requirements, that Citizens would be capital deficient and would need to shrink by selling assets and/or converting to stock form to regain capital compliance.

Pl.'s Br. filed Mar. 1, 2006, at 1.

Plaintiff has the correct position. A prudent regulator certainly would have realized that denying Citizens goodwill would render the thrift out of capital compliance and force Citizens to file a capital plan. Once the thrift

was forced to file a capital plan, a prudent regulator would foresee that it would be required to raise capital. The regulators were also aware that the principal methods of raising capital were conversions and sales of assets. Correspondingly, any prudent regulator would understand that raising capital would have a cost. A prudent regulator would have been aware that forcing Citizens to sell its Cincinnati division could cause it damages. Furthermore, in the factual discussion above, the court found that the regulators actually understood all of these factors at the time the contract was formed.

The instant case does not present the situation in *Old Stone Corp. v. United States,* 450 F.3d 1360, 2006 WL 1420817 (Fed.Cir.2006). In *Old Stone* a thrift formed an agreement with the regulators for goodwill accounting treatment in exchange for acquiring several troubled thrifts. When FIRREA breached this contract, the bank became unprofitable and eventually was seized. The bank sued, *inter alia,* for the $118 million it contributed in cash and stock to the failing thrifts under restitution and reliance theories. The Federal Circuit overturned this portion of the damages award, in part because it was "not foreseeable as a matter of law." *Id.,* at 1363. The Federal Circuit stated that, "the Court of Federal Claims did not explain how the breach ... caused the seizure [of the thrift]." *Id.,* at 1375. The plaintiff had not "called [the appellate court's] attention to any testimony in the record that will support the foreseeability of any of the[ ] assumptions" necessary to prove foreseeability. *Id.,* at 1376. "There was no proof that the attenuated claim of causation on which the [plaintiff] relies was foreseeable." *Id.,* at 1378.

The instant case is distinguishable from *Old Stone,* as both the causal link is not attenuated, *see id.,* at 1378, and the evidence is specific, definite, and persuasive, that the regulators foresaw the damages caused by the sale of the Cincinnati division and premature conversion. In *Old Stone* plaintiff complained that the thrift died a slow death due to the breaching provisions of FIRREA and the forced sale of assets, "because the thrift

itself was made less profitable (by some $12 million per year), leading to its ultimate demise." *Id.,* at 1375–76. No similar claim is made in the instant case; the damages sought are more proximate to the breach. The sale of the Cincinnati division, and the premature conversion, were both caused directly by the breaching provisions of FIRREA and the need to replace goodwill capital lost by selling assets and infusing equity. *Old Stone* was "not a case in which the thrift was seized because it lacked regulatory capital eliminated by FIRREA." *Id.,* at 1377. Plaintiff in the instant case, however, presents precisely that scenario: The Cincinnati division was sold due to lack of regulatory capital, and Citizens was forced to convert earlier than it would have elected for the same reason. Whatever market or general economic factors affected Citizens' performance, *see id.,* at 1366 (attributing problems with bank operations " 'general economic conditions at the time' ") (quoting *Old Stone Corp. v. United States,* 63 Fed.Cl. 65, 88 (2004)), Citizens proved that sale of the assets was caused overwhelmingly by the need to comply with FIRREA's new capital requirements.

Therefore, the court finds that these damages were foreseeable. Even if actual foresight were required, the court finds that the regulators had it.

### 2. *The January 1992 conversion*
#### 1) *FIRREA was the but-for cause of the premature conversion*

 Defendant absolves FIRREA as the cause of the conversion, but indicts the "economic conditions on the ground that ... required the raising of tangible capital." Tr. at 3561 (opening argument of defense counsel). In fact, defendant argues that "an economically rational manager would have been insane to wait [to convert]." Tr. at 3610. Plaintiff, presumably believing its witnesses to be quite sane, sets against this argument the testimony of Mr. Kirby and other members of Citizens' management team.

The court has accepted the testimony of Citizens' management, particularly Mr. Kirby, to the detriment of defendant's expert

testimony regarding when Citizens should have converted. Citizens was forced to convert earlier than it intended by the pressure of the regulators. The pressure of the regulators existed because Citizens was out of compliance with its capital requirements. Citizens was out of compliance with its capital requirements because of the breaching provisions of FIRREA. The documentary evidence supports this ultimate finding, and the proof is definite.

### 2) Damages resulting from the premature conversion were foreseeable

Defendant argues that neither the regulators nor the thrift had a "crystal ball" that would allow them to perfectly time the market to maximize stock proceeds. *See* Def.'s Br. filed Mar. 1, 2006, at 17. Even if Citizens could time the market, the regulators had no way of knowing that "the phase-out of supervisory goodwill would have prevented the exercise of this 'ability' [to time the market]." *Id.*

A prudent regulator would have foreseen that the removal of supervisory goodwill could force Citizens into capital deficiency, subject it to regulatory action, and possibly require it to convert outside of its preferred time frame. This prudent regulator would not need to believe that Citizens possessed a "crystal ball" that would allow it to time the market, but only that there were both good and bad times to convert, and therefore the timing of the conversion matters. In other words, a prudent regulator would only need to foresee that the timing of a conversion could affect the amount of proceeds realized and that loss of goodwill could affect the timing of a conversion. Assuming that Citizens could time the market, a prudent regulator could have foreseen that a regulatory solution that took away Citizens' ability to choose the time of its conversion could cause it damages.

Not only does the court determine that a prudent investor would foresee these damages, but that the actual regulators, e.g., Messrs. Muldoon and Lassiter, did foresee them.[24]

---

**24.** The court finds *Old Stone* distinguishable as to the foreseeability of conversion proceeds for the

### III. Damages proved to a reasonable certainty

Plaintiff bears the burden of proving its damages to a reasonable certainty. The court determines that plaintiff meets that burden on all counts, save its claim for lost operating profits, which is too speculative.

### 1. Damages associated with the restoration of the Cincinnati division

#### 1) Restored assets, the carrying cost of cash, and swaps

█ The court has made the following relevant findings of fact: First, for the purposes of the model, $400 million in Cincinnati assets (including $59 million in "runoff") should be restored to the hypothetical Citizens bank. Second, Citizens is entitled to the $1.365 million in costs associated with the carrying costs of cash. Plaintiff proved both of these claims to a reasonable certainty. Third, $4.98 million should be subtracted from the total damages for the cost of "swaps," as plaintiff conceded.

#### 2) Profits lost on the sale of the Cincinnati division

Plaintiff also proved to a reasonable certainty that, because of the breach, it lost the profits that it would have made on the sale of the Cincinnati division to Fifth Third in 1998. In addition, a reasonable basis was advanced for measuring these lost profits: the 7% deposit premium.

While lost profit claims in *Winstar* cases are often "not ... susceptible of proof due to [their] speculative nature," *Fifth Third VIII*, 402 F.3d at 1237, this particular claim has achieved reasonable certainty. In *Fifth Third IV*, 55 Fed.Cl. 223, the court granted partial summary judgment on plaintiff's lost profit claims in favor of defendant because plaintiff failed to "take account of the business prospects that were available to the But-for Citizens with its expanded asset base." *Id.* at 242. The court "reject[ed] as a matter of fact and law the notion that a bank's expanded asset base would realize

same reasons given above regarding the foreseeability of the sale of the Cincinnati division.

profits at a similar rate to that of its actual profits, absent an offer of evidence to show how the bank would have invested the augmented assets." *Id.* at 241.

In contrast, plaintiff's current claim for lost profits from 1998 on has presented the required evidence of a specific investment opportunity—its 1998 sale of assets to Fifth Third. If Citizens had retained the Cincinnati division and its deposits, Fifth Third also would have purchased the Cincinnati division. This claim does not suffer from the same speculative nature as plaintiff's other lost profits claims because it properly takes into account "the business prospects that were available to the But-for Citizens[.]" *Id.* at 242. Thus, the existence of lost profits is established to a reasonable certainty.[25]

All that is left to be determined is whether "there is some basis on which a reasonable estimate of the amount of profit can be made." *Neely,* 285 F.2d at 443. Plaintiff provides this basis with the 7% deposit premium, as discussed earlier, and proves it to a reasonable certainty. Plaintiff proved these damages to be $12.111 million.

### 3) Lost operating profits from 1992–1998

■ Plaintiff also claims lost operating profits for the Cincinnati division between 1992 and 1998. To measure these lost operating profits, plaintiff simply adjusts downward the Dayton division's rate of return on assets and then multiplies it by the asset base. Defendant objects, stating that "[t]his court ... in the ruling on defendant's motion for summary judgment on damages, has already held that Dr. Brumbaugh's '[B]ut[-]for' thrift model is speculative because there is no evidence that...the return on investment would be the same as the actual thrift." Def.'s Br. filed Dec. 16, 2005, at 34–35 (citing *Fifth Third IV,* 55 Fed.Cl. at 236–42.) De-

fendant complains that plaintiff "now seeks to resurrect the model[.]" *Id.* at 35.

The court agrees with defendant; the 1992 to 1998 lost operating profits claim is all but identical to the lost profit claims rejected as too speculative in *Fifth Third IV.* This court has already "reject[ed] as a matter of fact and law the notion that a bank's expanded asset base would realize profits at a similar rate to that of its actual profits ...." *Id.* at 241. The same methodology was followed for the instant claim of lost operating profits-the base rate of earnings for Citizens was marked down and posited as a rate of return on assets. Because the method has not changed, neither should the ruling. In contrast to the lost profits claim for 1998 forward, which offered evidence of a definite investment opportunity in the sale of assets to Fifth Third, the claim for lost operating profits is not based on any identified investment opportunities. Because this hypothetical rate of return on the Cincinnati division's assets is too speculative to prove the assets would have accrued profits, plaintiff has not proved its damages to a reasonable certainty.[26]

### 2. Damages associated with the premature conversion

#### 1) The August 1993 conversion date is reasonable

■ Defendant argues that plaintiff has not proved conversion damages to a reasonable certainty because plaintiff put forth insufficient evidence for the proposed August 1993 conversion date. Finding to the contrary, the court accepts the analysis of Mr. Riggins regarding the August 1993 conversion date, as it was based upon the conditions set by Citizens' management team. Plaintiff has proved this date to a reasonable certainty.

---

25. The court's finding would remain the same even if the standard required that lost profits to be definitely established.

26. It should also be noted that plaintiff argued any offsets to its 1992 to 1998 lost profits claim for the Cincinnati division would take the form of mitigation and thus be disallowed under the law of the case. Defendant contested that these offsets be viewed as mitigation.

While interesting as an academic matter, this argument is mooted by the court's decision not to award lost operating profits for the Cincinnati division between 1992 and 1998. Out of an overabundance of caution, the court made factual findings on the related damages issues, lest such findings later become necessary after the record is as cold as it is old. The court declines to offer dicta on the legal aspects of the mitigation argument.

### 2) *Reduced conversion proceeds as a measure of damages*

Defendant contests the concept that reduced conversion proceeds can be a measure of damages. At the heart of this dispute is a difference of opinion between plaintiff and defendant regarding the nature of a sale of stock. Plaintiff views the sale of stock to be a sale of property, i.e., the ownership interest in the company. It asks the court to "treat the sale of stock like the sale of any other property, and, under general principles of contract law, find that Citizens has been damaged by the decrease in sale price caused by [d]efendant's breach." Pl.'s Br. filed Mar. 1, 2006, at 8. Defendant views the sale of stock much like a loan from the shareholders to the corporation, for which the shareholders are repaid with dividends. "Because higher proceeds entail higher obligations to the providers of capital, reduced conversion proceeds do not injure the thrift and therefore are not a form of expectancy damages." Def.'s Br. filed Mar. 1, 2006, at 13. The court concludes that the amount of reduced proceeds can be considered damages.

#### i) *Legal standards*

Little argument is mustered about the legal treatment, once it is decided if the sale of stock more resembles a loan than a sale of property. Plaintiff, arguing that it is most like a sale of property, measures the proper damages as the difference between the low sale price and the high sale price. "In the case of the sale of goods, . . . a buyer's or seller's damages are based on the difference between the contract price and the market price on that market where the injured party could have arranged a substitute transaction for the purchase or sale of similar goods." Restatement (Second) of Contracts § 350 cmt. c (1981). In other words, a seller is entitled to "recover the difference between the resale price and the contract price."

U.C.C. § 2–706.[27] This would be the difference between the $31.9 million "sale" price of the thrift in January 1992, and the $84 million hypothetical sale price in August 1993, subject to certain adjustments.[28]

Analogizing conversion proceeds to a loan that must be paid back to the shareholders, defendant argues that "unless there are clearly defined investment opportunities the thrift must forego because of a lack of equity, it will suffer no injury from reduced conversion proceeds." Def.'s Br. filed Mar. 1, 2006, at 31. The proper measure of damages, then, would be the lost profits on the "loan" of the conversion proceeds, rather than the conversion proceeds themselves. Defendant cites the United States District Court for the Northern District of Indiana for the proposition that damages on the loss of a loan are only the profits lost on investment opportunities, not the principal amount of the loan itself. *See Lincoln National Life Ins. Co. v. NCR Corp.,* 603 F.Supp. 1393, 1409 (N.D.Ind. 1984), *aff'd* 772 F.2d 315 (7th Cir.1985). Plaintiff does not dispute this point as far as it goes.

Defendant also argues that Mr. Riggins's model would result in a windfall gain to plaintiff. *See Hansen Bancorp, Inc. v. United States,* 367 F.3d 1297, 1315 (Fed.Cir.2004) (holding that "[c]ourts should avoid bestowing an 'unfair windfall' on the plaintiff by compensating him or her above and beyond the losses suffered under the breached agreement"). Mr. Riggins's model, when increasing conversion proceeds, also increases the number of stock shares issued, and then "ignores the issuance of these additional shares." Def.'s Br. filed Mar. 1, 2006, at 30.

Defendant declares that "we are aware of" no cases that hold "reduced conversion proceeds are a form of expectancy damages[.]" Def.'s Br. filed Mar. 1, 2006, at 13. Plaintiff fares little better in supporting the proposition.[29] However, plaintiff does point out that

---

**27.** The Federal Circuit has written that, although not applicable in this jurisdiction, the U.C.C. is "useful guidance in applying general contract principles." *See Hughes Commc'ns Galaxy, Inc. v. United States,* 271 F.3d 1060, 1066 (Fed.Cir. 2001).

**28.** The $84 million is the conversion amount for the hypothetical bank that includes the Cincinnati division, but not the Cincinnati division's 1992 to 1998 operating profits.

**29.** Plaintiff cited numerous secondary authorities for the proposition that a sale of stock is a sale of equity and also a sale of a property interest. *See,*

FHLBB Conversion Guidelines for thrifts, while by no means binding on the court, state that "a conversion is akin to a sale of a thrift from the mutual owners to its new stockholders." Expert Report of Ronald S. Riggins, FHLBB Conversion Guidelines, PX 1487, Ex. 2, at 1.[30]

ii) *Reduced conversion proceeds are appropriate as damages*

Defendant walks a thin line between novel argument and self-contradiction. Defendant now says that the proper measure of damages from lost conversion proceeds is the profits lost on the conversion proceeds, rather than the proceeds themselves. However, in 2003 defendant moved for summary judgment on all of plaintiff's lost profits claims and, for the most part, prevailed. *See Fifth Third IV*, 55 Fed.Cl. 223. Defendant is careful to note that these lost profits on the conversion proceeds must result from "clearly defined investment opportunities." Def.'s Br. filed Mar. 1, 2006, at 31. Nonetheless, such damages have "not been susceptible of proof due to [their] speculative nature." *Fifth Third VIII*, 402 F.3d at 1237. If plaintiff were claiming profits lost on the "loan" of conversion proceeds under defendant's theory-lost profits that plaintiff represents would likely yield damages far in excess of the actual lost conversion proceeds claimed-the court has little doubt that defendant would argue the speculative nature of these lost profits.

In any event, the court determines that lost conversion proceeds are a proper measure of plaintiff's damages. While an initial public offering of stock certainly has some of the characteristics of both a loan and a sale of assets, the court finds it more analogous to a sale of assets. As the FHLBB Conversion Guidelines explain: "[A] conversion is akin to a sale of a thrift from the mutual owners to its new stockholders." Expert Report of Ronald S. Riggins, FHLBB Conversion Guidelines, PX 1487, Ex. 2, at 1. The thrift, in converting to a corporation, is selling to its shareholders an ownership interest in the corporation, as the court has previously held. *See Fifth Third V*, 55 Fed.Cl. at 379. These assets have value, as does the shareholders' control over them.

On the other hand, the initial sale of stock has relatively few of the characteristics of debt. As the court has ruled, Citizens is not obligated to its shareholders to pay dividends. While defendant views stock as a stream of assets that accrue to the shareholders, such a stream of assets may or may not materialize. A shareholder has a claim on assets only if the firm is liquidated. In short, stock is, by definition, an issuance of equity not of debt, and the court finds that, at least in the instant cast, it has more characteristics of equity than of debt.

Put another way, the initial sale of stock is more analogous to a sale of property than to a loan from investors. The court will treat the initial sale of stock much as it would treat an initial sale of property. Plaintiff claims a net $44.235 million in damages for lost conversion proceeds (with the Cincinnati division restored, but without operating profits). Because the court has credited Dr. Brumbaugh's model on this calculation, plaintiff

e.g., Richard A. Lord, Williston on Contracts § 51:2 (4th ed.2000) ("Shares of stock, which represent the holder's partial but undivided ownership of the corporation, constitute a property interest quite distinct from the capital or tangible assets of the corporation.").

Plaintiff also analogized defendant's conversion-proceeds-as-loan theory to the Net Present Value-zero theory, which it represents has been "rejected numerous times by this [c]ourt." Pl.'s Br. filed Mar. 1, 2006, at 8 n. 11. While an interesting theory, this proved to rest on only one trial court opinion, *Anchor Sav. Bank, F.S.B. v. United States*, 59 Fed.Cl. 126, 149–50 (2003).

Finally, plaintiff also notes a recent case out of the United States District Court for the Southern District of New York that denied summary judgment on an analogous issue. *See Creditor Trust v. Credit Suisse First Boston, Inc.*, 399 F.Supp.2d 375, 382 (S.D.N.Y.2005) (denying summary judgment on claim that stock underwriter breached fiduciary duty to firm by underpricing its initial public offering and thus depriving firm of "opportunity to raise more capital").

30. The FHLBB Conversion Guidelines also note that, "[t]he issue of most concern to the Board in the appraisal process is that the stock not be underpriced. . . . Thus, achieving the full value from the conversion to enhance net worth is one of the primary goals of the conversion process." Expert Report of Ronald S. Riggins, FHLBB Conversion Guidelines, PX 1487, Ex. 2, at 1.

has proved these damages to a reasonable certainty.[31]

### iii) *Alternatively, conversion proceeds are a reasonable approximation*

When damages are not proved with mathematical precision, "the court's duty is to 'make a fair and reasonable approximation of damages.'" *Bluebonnet Sav. Bank*, 266 F.3d at 1356–57 (quoting *Locke*, 283 F.2d at 524). Although the court concludes that stock conversion proceeds are an acceptable type of damages, even if this were not so, the court would find them to be a fair and reasonable approximation in the instant case, as they are the only method that has proved itself susceptible to proof.

It may be that in these damage calculations, economics and the law have slightly different aims. In economics defendant argues that lost profits on the "loan" of the conversion proceeds are the proper measure of damages, whereas the law views this measure of damages as often speculative and impractical to prove. Defendant's economic experts make some sense in theory, but in practice the lost profits determined by a "loan" theory of conversion are difficult to determine with sufficient certainty.

It is the court's duty "to 'make a fair and reasonable approximation of damages.'" *Bluebonnet Sav. Bank, FSB*, 266 F.3d at 1356–57 (quoting *Locke*, 283 F.2d at 524). Plaintiff might have had hundreds of millions in damages if it were allowed lost profits, but its proofs ran afoul of the difficulty of "establishing what might have been[.]" *Glendale I*, 239 F.3d at 1380. Lost conversion proceeds are the measure that has been susceptible to valid and convincing proof. The court views them as a "fair and reasonable" approximation of damages.

### 3. *Total damages*

The damages associated with the Cincinnati division total $8.469 million.[32] The damages for the premature conversion, with the Cincinnati division restored, but without operating profits, are $44.235 million. Therefore, plaintiff's total damages before gross-up are $52.731 million.

### IV. *Tax gross-up*

In Plaintiff's Supplemental Memorandum of Contentions of Fact and Law Regarding Damages and Related Issues, plaintiff asked for a ruling barring defendant from introducing expert testimony in lieu of testimony from the IRS concerning whether any award received from conversation proceeds would be taxable. Plaintiff specifically requested invocation of the missing witness rule, which warrants drawing an inference against the party capable of producing, but refusing to produce, the competent witness. *See Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1384 n. 7 (Fed.Cir.2001) (invoking missing witness rule to draw unfavorable inference where plaintiff knew of witness within its control with information on material issue, but chose not to call him); *A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1399–1400 (Fed.Cir.1986) (same); *In re Contract Master Serv., Inc.*, 225 Ct.Cl. 735, 737 (1980) (disagreeing with trial court's invocation of missing witness rule because witness not under control of party against which inference was drawn). As plaintiff aptly characterized the situation:

> The DOJ has hired prospective expert Professor Paul Griffin, with taxpayer dollars, at a rate of $495 per hour, to spend time arguing with Fifth Third over whether the IRS will or will not tax a damage award.

---

**31.** The record also does not support defendant's argument that, because Mr. Riggins's conversion model issues more shares than the actual conversion, plaintiff will receive an "unfair windfall." Defendant has not shown why the number of shares of stock issued matters *per se*. The court sees no difference between issuing, e.g., 6.5 million shares of stock at $10.00 per share, as does Mr. Riggins's hypothetical conversion, *see* Rebuttal Report Pertaining to Conversion Valuation (Sept. 26, 2002), PX 1498, Ex. C at 2, and holding the number of shares constant at the January 1992 level of 4.025 million shares, but charging

$16.15 per share. Both methods raise $65 million. The court does not find that one would cause a windfall, and the other would not, merely because in one method more shares are issued at a lower price, while in the other method, fewer shares are issued at a higher price.

**32.** This amount is calculated as follows: $0.0 (1992–1998 lost profits) + $12.111 million (post–1998 lost profits)—$4.98 million (swaps) + $1.365 million (carrying cost of cash).

This is an egregious waste of Fifth Third's time, the Court's time, and the American taxpayer's money.

Pl.'s Br. filed Nov. 22, 2005, at 25. Plaintiff went on to address how the Department of Justice, in another case, frustrated the presentation of testimony by an IRS agent. *See id.* at 26.

At the pretrial conference held on January 3, 2006, in deference to the age of the case, the fact that one of defendant's two lead attorneys was required to come out of retirement from his law firm to try the damages phrase on remand, and defendant's refusal to produce an IRS witness who would testify, the court ruled:

> Given the fact that the IRS is not in a position to make any definitive statement as to how it views the award and wants to take the position to look at this matter later, we are having a trial, and there has been no indication that this award would not be taxable, and although it's [p]laintiff's burden to prove that, [p]laintiff has done everything possible to flesh this issue out, and the [G]overnment has been uncooperative so I'm making that ruling as a matter of law.

Transcript of Proceedings, *Fifth Third Bank of W. Ohio v. United States,* No. 95–503C, at 12–13 (Fed.Cl. Jan. 3, 2006) ("Jan. 3, 2006 Tr.").

Defendant makes its position more brazen in its March 1, 2006 post-trial brief by arguing that "Fifth Third's request for a preemptive refund of future taxes 'effectively block[s] the exercise of [the] sovereign power to tax,' and is accordingly barred by the unmistakability doctrine." Def.'s Br. filed Mar. 1, 2006, at 38. n. 13 (alteration in original) (quoting *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1579 (Fed.Cir. 1997)).[33] The court therefore ruled as a matter of law during the pretrial conference that an award of conversion proceedings would be taxable as income. *See* Jan. 3, 2006 Tr. at

13; *see also* Order entered Jan. 4, 2006, ¶ 10. Because defendant had prevented plaintiff from introducing the most reliable testimony that conversion proceeds would not have been taxed in a world without the breach, plaintiff was entitled to a gross-up as a matter of law. The court reserved the issue of the appropriate rate of income taxation for trial, *see* Order entered Jan. 4, 2006, ¶ 10, and took evidence on the matter. As set out in the factual discussion above, it was determined that 35% was an appropriate tax rate for the gross-up, based upon plaintiff's marginal rate of taxation.

After setting forth the reasoning for the January 4, 2006 ruling, the court calculates the total damages after gross-up.

### 1. *Legal standards and application*

Last year, prior to trial in this matter, the Federal Circuit addressed as a matter of first impression the possibility of tax gross-ups for *Winstar* damage awards. The Federal Circuit held that it would "adopt the rule of other courts that a tax gross-up is appropriate when a taxable award compensates a plaintiff for lost monies that would not have been taxable." *Home Sav. of Am., FSB v. United States,* 399 F.3d 1341, 1356 (Fed.Cir. 2005) ("*Home Savings II*") (citing, *inter alia, Oddi v. Ayco Corp.,* 947 F.2d 257, 267 (7th Cir.1991)).

■■■ This prescription for proving that a damage award should be grossed-up requires two showings: The money lost due to the breach would not, at the time of the breach, have been subject to taxation, and the damages awarded would be subject to taxation. *See Home Savings II,* 399 F.3d at 1356. Of these two requirements, the parties agree on the first: "[T]he parties have stipulated that reduced conversion proceeds would not have been taxable if they had been received in the course of the conversion." Def.'s Br. filed Dec. 16, 2005, at 37.

---

**33.** Defendant offered that, if the court were to award conversation proceeds in a bifurcated proceeding, "the parties may seek advice from the IRS on the taxability of the award and, in any event, will be in a more informed position to present evidence and argument to the [c]ourt

concerning the propriety of the claimed 'gross-up.' " Jt. Mot. for Leave To File Agenda for Pre-Trial Conference Scheduled for January 3, 2006, filed Jan. 3, 2006, at 9 (defendant's separate statement).

The second part of *Home Savings* requires a plaintiff to prove that any damage award would be taxed. *See Home Savings II*, 399 F.3d at 1356; *Home Sav. of Am., F.S.B. v. United States*, 57 Fed.Cl. 694, 730 (2003) ("*Home Savings I*"), *aff'd* 399 F.3d at 1356. Under the Internal Revenue Code, all income not excluded by law is taxable. 26 U.S.C. § 61(a) (2000) ("Except as otherwise provided in this subtitle, gross income means all income from whatever source derived . . . ."); *see also United States v. Burke*, 504 U.S. 229, 237, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) (holding that, when damages are awarded for sort of income excluded from taxation by exception to 26 U.S.C. § 61, so, too, is damage award excluded).

Defendant argues that the "origin of the claim" doctrine excludes an award of a gross-up. Essentially, defendant's argument is that the "origin of the claim" doctrine requires the IRS to look to the underlying source of the damages received by a plaintiff in a legal judgment. *See Raytheon Prod. Corp. v. Comm'r*, 144 F.2d 110, 113 (1st Cir.1944) (holding that "[t]he test is not whether the action was one in tort or contract but rather the question to be asked is 'In lieu of what were the damages awarded?'"). If the origin of the claim is an untaxable source, such as conversion proceeds, the IRS will not tax the proceeds of the judgment, and therefore plaintiff should not be awarded a gross-up. Conversely, if the origin of the claim is a taxable source, such as lost profits, the IRS will tax the proceeds; because they would have been taxable even in a world without this particular breach of contract, this taxation is appropriate.

Plaintiff responds that this argument proves too much. Defendant's interpretation of the law would never require a gross-up, because either the origin of the claim is taxable and the IRS appropriately taxes the judgment, or the origin of the claim is non-taxable and the IRS refrains from taxing the judgment. As plaintiff states the conundrum: "[I]f the inquiry were that simple, *no*

*tax gross-up could ever be awarded . . . .*" Pl.'s Br. filed Nov. 22, 2006, at 13. Plaintiff argues that this cannot be correct, because the Federal Circuit, in *Home Savings II*, 399 F.3d at 1356, affirmed a gross-up of *Winstar* damages.

In *Home Savings I*, the court determined, after a trial on the merits, that the damages award it gave plaintiffs would be taxed by the IRS. The plaintiffs in *Home Savings* argued that their damage award would be taxed under 26 U.S.C. § 61(a)(2) (2000), as "gross income derived from business." *See Home Savings I*, 57 Fed.Cl. at 730. Observing that defendant had identified no exception, the court ruled that the damage award would be grossed-up. *Id.* ("There is nothing to suggest that plaintiffs are not correct.").

The Federal Circuit affirmed this ruling. The Federal Circuit reviewed the finding under a "clear error" standard, stating that "[t]he [trial] court further determined that the award would be taxed as gross income . . . . Th[is] conclusion[ ] [is] not clearly erroneous." *Home Savings II*, 399 F.3d at 1356. The Federal Circuit also affirmed the trial court's implicit holding that the original source of the damages would not have been taxable. *Id.* ("The Court of Federal Claims found that [plaintiff]'s award compensated it for lost monies that would not have been taxable . . . . Th[is] conclusion[ ] [is] not clearly erroneous.").

Plaintiff argues instead that, while the conversion proceeds would not have been taxable in 1993, in 2006 the IRS will view the proceeds as part of a judgment on a breach of contract claim, which the court has characterized as expectancy damages, and tax them accordingly. Pl.'s Br. filed Nov. 22, 2005, at 12–13. As plaintiff contends: "There is no legal exclusion [to 26 U.S.C. § 61] for breach of contract damages such as the one for damages in a personal injury suit." *Id.* at 12. Defendant did not contradict this position. Instead of mustering legal authority to exclude the type of breach of contract damages involved, defendant relied upon its interpretation of the "origin of the claim" doctrine.[34]

---

**34.** The report of defendant's expert, Paul A. Griffin, which was not admitted in view of the court's ruling, opines that the additional pro-

ceeds would not be taxable because they would contribute permanently to the future operation of

Plaintiff has stipulated, by and through its counsel, that Fifth Third will report any grossed-up award to the IRS as taxable income and will repay to the Government any portion of the award that ultimately is *not* taxed. Pl.'s Br. filed Nov. 22, 2005, at 6; *see also* Jan. 3, 2006 Tr. at 14 (stating that plaintiff will pay in the first quarter following the award).

Finally, defendant argues that, because of the uncertainties surrounding tax law and the amount of plaintiff's income, plaintiff has not proved its 35% tax rate to a reasonable certainty. Def.'s Br. filed Mar. 1, 2006, at 39. Because plaintiff discharged its burden of proof on this issue, as stated in the factual discussion above, the court found that plaintiff had established its 35% tax rate to a reasonable certainty.[35] It should be noted that the Federal Circuit in *Home Savings II* was unimpressed by defendant's general complaints about the speculativeness of adjusting damages awards based on projected rates of taxation. *See* 399 F.2d at 1355–56.

The court may have rendered plaintiff a disservice in ruling against defendant on the tax gross-up issue as a penalty for lack of cooperation. Although the court expressed its ruling as "a matter of law," *see* Jan 3, 2006 Tr. at 13; Order entered Jan. 4, 2006, ¶ 10, this ruling was based on defendant's trial strategy. Instead of offering cogent testimony, it declined to allow an IRS agent to testify, thereby rendering plaintiff's subpoena futile. Defendant, for its part, offered to obtain an IRS opinion to resolve the issue definitively, if the issue were rendered against it based on a duel of experts. *See supra* note 33. The court excused plaintiff's expert based on its ruling. Hopefully, the court's long experience with this case and

familiarity with the parties' respective tactics will reinforce its ruling in view of defendant's lack of cooperation and candor on this issue.

Out of an abundance of caution, the court would enter judgment in an amount not reflecting a gross-up. If the IRS were to tax the award, plaintiff could reopen the final judgment pursuant to Fed.R.Civ.P. 60(b). *Accord Bank of Am., FSB v. United States*, 70 Fed.Cl. 246, 253 (2006) (denying motion for reconsideration based on availability of Rule 60(b) relief). However, as noted by Sr. Judge Wiese in *Bank of America*,[36] the Government will litigate the propriety of Rule 60(b) relief in this situation, which would render this option a waste of more time and resources.

### 2. Total damages awards after gross-up

The appropriate tax rate is 35%, so any damage awards subject to gross-up shall be divided by 1.0 minus 0.35, or 0.65.

The $8.469 million in damages associated with the sale of the Cincinnati division are not grossed-up. They would have been taxable in a world absent the breach and so are "taxable" now.

The $44.235 million in conversion proceeds are grossed-up. Although they would not have been taxable in a world absent the breach, they must be marked up to compensate for the federal taxes that plaintiff will pay on them as breach damages. When divided by 0.65, the grossed-up conversion proceeds claim is $68.054 million.

The total damages claim for both the Cincinnati division and the grossed-up conversion proceeds is thus $76.523 million.

the business and not benefit directly the real party in interest.

**35.** The court notes that in *Home Savings I*, 57 Fed.Cl. at 730, the Government made similar arguments regarding the uncertainty of the tax rate. Judge Bruggink also found these arguments unavailing; ruled that the tax rate was established to a reasonable certainty, *id.;* and was affirmed on appeal, *Home Savings II*, 399 F.3d at 1356.

**36.** The Government argued, according to Sr. Judge Wiese,

that any relief available to plaintiff must come in the form of an independent action before either this court or the tax court. That is the case, defendant contends, because the issue of whether plaintiff has been made whole on its contract claim is separate and distinct from the issue of the award's taxability. Finally defendant maintains that the declaration plaintiff now seeks amounts to an advisory opinion, something the court has no power to render in this case.

70 Fed.Cl. at 252.

## CONCLUSION

Accordingly, based on the foregoing, the Clerk of the Court shall enter judgment for plaintiff in the amount of $76,523,000.00, representing plaintiff's full entitlement on all of the damages claimed that it proved by a preponderance of the evidence.

**IT IS SO ORDERED.**